FILED

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

2011 AUG -5 ℗ 2: 2b

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| **SUNTRUST MORTGAGE, INC.**<br>919 East Main Street<br>Richmond, Virginia 23219<br><br>Plaintiff,<br><br>v.<br><br>**GEORGE MASON MORTGAGE, LLC**<br>4100 Monument Corner Drive – Ste. 401<br>Fairfax, Virginia 22030<br><br>**ALICIA S. KING**<br>13749 Piedmont Vista Drive<br>Haymarket, Virginia 20169<br><br>**JAMES PODRATSKY**<br>5856 Tulloch Spring Court<br>Haymarket, Virginia 20169<br><br>**MICHAEL ROGERS**<br>9690 Bedder Stone Place<br>Bristow, Virginia 20136<br><br>**AMBER WRIGHT**<br>805 Wide Oak Court<br>Warrenton, Virginia 20186<br><br>**SAMANTHA DOGAN**<br>4022 Gallows Road<br>Annandale, Virginia 22003<br><br>**DONNA HALE,**<br>7781 Sharpshooters Court<br>Manassas, Virginia 20111<br><br>Defendants. | Civil Action No.: 1: 11cv830<br>TSE/TRJ |

<u>**COMPLAINT FOR TEMPORARY, PRELIMINARY AND PERMANENT
INJUNCTVE RELIEF AND MONEY DAMAGES**</u>

COMES NOW the Plaintiff, SunTrust Mortgage, Inc., (hereinafter, "SunTrust"), by and through its undersigned counsel, and for its Complaint for Temporary, Preliminary and Permanent Injunctive Relief and Money Damages against Defendants George Mason Mortgage LLC (hereinafter, "GMM"), Alicia King, James Podratsky, Michael Rogers, Amber Wright, Samantha Dogan and Donna Hale, states as follows:

## INTRODUCTION

1.     SunTrust brings this action against six of its former employees and the entity that now employs them, GMM, to prevent future loss and to recover damages caused by their ongoing unlawful scheme to divert SunTrust's business opportunities and steal its employees, trade secrets and proprietary information.

2.     All of the individual Defendants resigned from SunTrust between May 12, 2011 and June 30, 2011. Pursuant to a coordinated plan, several of the individual Defendants left in May 2011 to get themselves established in the Gainesville office of GMM, while others remained at SunTrust to ensure that they would retain access to SunTrust's proprietary information and would be better positioned to divert clients to GMM.

3.     Over the course of approximately six weeks, the individuals that remained employed by SunTrust – chiefly King – solicited borrowers and referral sources using their SunTrust positions, titles and email addresses, secured loan applications using SunTrust documents, and then repeatedly and surreptitiously routed those materials to their co-conspirators at GMM, where the loans were closed.

4.     SunTrust has and will continue to suffer irreparable harm from these acts unless the Defendants are enjoined by the Court.

## PARTIES

5.      SunTrust Mortgage, Inc. is a Virginia corporation with its principal place of business and corporate headquarters in Richmond, Virginia. SunTrust is a wholly-owned subsidiary of SunTrust Bank, Inc.

6.      George Mason Mortgage LLC is, on information and belief, a Virginia limited liability company with its principle place of business in Virginia.

7.      Alicia King is an individual resident of Virginia who, until June 27, 2011, was employed by SunTrust as a Loan Officer in its Gainesville branch office. King is now employed in a nearly identical capacity for GMM in its Gainesville branch office.

8.      James Podratsky is an individual resident of Virginia who, until May 12, 2011, was employed by SunTrust as a Vice President and Branch Manager in its Gainesville branch office. Podratsky is now employed in a nearly identical capacity for GMM in its Gainesville branch office.

9.      Michael Rogers is an individual resident of Virginia who, until May 31, 2011, was employed by SunTrust as a Mortgage Production Assistant in its Gainesville branch office. Rogers is now employed in a nearly identical capacity for GMM in its Gainesville branch office.

10.     Amber Wright is an individual resident of Virginia who, until June 30, 2011, was employed by SunTrust as a Mortgage Loan Processor in its Gainesville branch office. Wright is now employed in a nearly identical capacity for GMM in its Gainesville branch office.

11.     Samantha Dogan is an individual resident of Virginia who, until June 1, 2011, was employed by SunTrust as a Loan Officer in its Gainesville branch office.

Dogan is now employed in a nearly identical capacity for GMM in its Gainesville branch office.

12.     Donna Hale is an individual resident of Virginia who, until May 31, 2011, was employed by SunTrust as a Mortgage Loan Processor in its Gainesville branch office.  Hale is now employed in a nearly identical capacity for GMM in its Gainesville branch office.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction of this matter pursuant to 28 U.S.C. §1331, in that part of this action derives from federal claims.

14.     Defendant GMM is subject to personal jurisdiction in the Commonwealth of Virginia because it is a resident of Virginia and transacts business in Virginia, among other reasons.

15.     All the individual Defendants are subject to personal jurisdiction in the Commonwealth of Virginia because they are residents of Virginia.

16.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district and all Defendants are subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

### SunTrust Mortgage, Inc.'s business

17.     SunTrust originates and services home mortgage loans in 49 states and the District of Columbia, including Virginia.  The Company is regularly ranked among the top ten home mortgage lenders in the United States, the most recent ranking coming in the first quarter of 2011.  SunTrust has an outstanding reputation in the industry as a

leader in client satisfaction, and it has received numerous awards and recognitions. Every years since 2007, for example, SunTrust has been ranked consistently among the top one or two mortgage lenders in customer satisfaction by several different rankings organizations.

18.     SunTrust guards its reputation well, and it takes steps to ensure that its employees conduct themselves with honesty and integrity and in the most forthright manner with consumers, referral sources such as brokers and realtors, and competitors.

19.     SunTrust has numerous mortgage offices and locations in Northern Virginia, including a location at 8078 Crescent Park Drive in Gainesville, Virginia.

20.     At SunTrust, Loan Officers (such as King and Dogan) work closely with Loan Processors (such as Wright and Hale) to secure mortgage loan business for the Company.  Loan Officers identify and solicit potential borrowers and referral sources to provide SunTrust's services.  Among other duties, they analyze prospective borrower's financial information, counsel borrowers in the home buying and financing process, advise borrowers regarding clearing credit issues, counsel borrowers on the financial and long term impact of various loan products, and prequalify the borrowers for mortgage loans.  In addition, they secure loan applications from borrowers, order appraisals, secure income documentation and other financial information, and take the steps necessary to assemble a complete loan application package on the borrower's behalf.  The package is then submitted to a Loan Processor, who validates all the information, may obtain additional information from the borrowers and submits the loan request to the underwriting department.  Some Loan Officers use assistants in connection with their work.  Rogers was King's assistant.

**The Defendants conspire to damage SunTrust's business.**

21.     All of the individual Defendants once worked for SunTrust at its Gainesville Branch.  Podratsky was the branch manager, and in that capacity was in charge of the branch's day-to-day operations.  The other individual Defendants reported to him, either directly or indirectly.

22.     On or about April 25, 2011, Podratsky was formally offered employment at GMM's branch office in Gainesville.  But his discussions with GMM predated the offer letter by several weeks.  As early as four to six weeks before he resigned, Podratsky solicited the other individual Defendants to resign from SunTrust and join him at GMM. He told other SunTrust Gainesville office employees that nearly everyone on his staff was "on board" with the move and that soon employees would begin seeing a "mass exodus."  In fact, just before he announced his resignation to his manager, Podratsky assembled a large contingent of his team and informed them that he had secured a place for nearly everyone of them at GMM.  King, Rogers, Wright, Dogan and Hale, accepted his offers and each plotted their departures accordingly.

23.     In the course of these discussions, the individual Defendants hatched a plan that they believed would allow them to jump-start their mortgage loan business at GMM and, at the same time, deliver a blow to SunTrust's larger and more established business.  Their plan called for several employees – Podratsky, Rogers, Hale and Dogan – to leave SunTrust in May or early June so they could become established in the GMM branch office.  King and Wright were to remain behind at SunTrust for several additional weeks to steal SunTrust clients, business opportunities, proprietary business information and trade secrets.  The scheme allowed King and Wright to preserve their access to

SunTrust's proprietary information and potential clients while they steered borrowers from SunTrust to GMM.

24.     King was one of the principal co-conspirators, and the specific circumstances of King's final weeks at SunTrust and her communications with GMM make the conspiracy, and her role in it, clear.  For example:

  a.  Podratsky encouraged King to accept employment with GMM even before he resigned on May 12, 2011.

  b.  King was officially offered employment by GMM with an offer letter dated May 17, 2011, only five days after Podratsky began working for GMM.  She accepted immediately, knowing, of course.  *Still, she would not tender her resignation to SunTrust until June 27, 2011 – more than forty days later.*

  c.  As early as June 1, 2011 – *nearly a month before King tendered her resignation to SunTrust* – Podratsky authorized King to be granted access to the "George Mason Secure Email Message Center."  King used this access to set up a secure GMM email on GMM's server.  Later, she would email SunTrust documents from her SunTrust email account to her GMM email account, the address for which was  "aking@gmmllc.com."

  d.  On June 9, 2011 – a Thursday – King emailed Podratsky to inquire whether she could begin active, open employment at GMM earlier than expected.  The subject of the email is "CAN I START ON MONDAY?" and the text continues:  "And give notice next Thursday?  I really need to get over there……….and really need a paycheck as quickly as possible."

Despite her desire to move earlier, King did not start at GMM until June 27, 2011.

25.     The significance of these events is clear.  GMM gave King an active GMM email address to allow her to conduct business out of SunTrust's sight, but it delayed her start date to allow her time to steer SunTrust customers to GMM and to steal SunTrust's information.  Even King's June 9 email betrays her intent to begin working officially for GMM on June 13, 2011, but to delay her resignation from SunTrust.  Clearly, King had no reservations about having her employment for the two competing companies overlap.

**King and Wright divert business from SunTrust to GMM.**

26.     Throughout this period – from at least mid-May until King's resignation on June 27, 2011 and Wright's resignation on June 30, 2011 – King and Wright collected paychecks from SunTrust while they worked collaboratively to divert business opportunities to GMM.

27.     King, in particular, solicited borrowers and referral sources using her SunTrust email address, and she began processing loans using SunTrust loan applications, disclosures, waivers and other SunTrust documents.  But King did not close the loans for SunTrust; instead, she repeatedly routed the loan applications and paperwork to GMM and assisted GMM employees, including but not limited to Podratsky, Rogers, and the other Defendants, in closing the loans for GMM.

28.     On May 31, 2011, *nearly a month before she would notify SunTrust of her own resignation,* King, using her SunTrust email address, emailed Podratsky at his GMM email address.  In the message, King identified by name six specific borrowers and wrote:

8

"I need your honest opinion as to whether you have the capacity to close these [home loans] so that the clients and agents aren't frustrated w/me.  If it's in everyone's best interests to close them here [at SunTrust], I can.  Thanks Bossman!"  Of these six clients, three eventually withdrew their applications with SunTrust, and two more were not listed by King on her SunTrust pipeline – thus ensuring that no one else at SunTrust knew of the clients' existence.  For each client identified, King supplied pertinent information about the loan, advised as to the target interest rate necessary for GMM to capture the business, or asked whether GMM had all the information it needed to capture the business.  For one of these borrowers, King noted:

> "I MAY BE SWITCHING THIS FROM STM TO YOU TODAY!
> What rate can you get me with borrower paying 1.25 points for
> FHA high balance, credit scores 745, 15 day lock."

29.     This email set the tone for King's activities in conjunction with the other Defendants over the course of the subsequent month, during which time the Defendants worked tirelessly to convert multiple borrowers from SunTrust to GMM, usually midway through the loan application and underwriting process.  King typically corresponded with the borrowers using her SunTrust email address.  She supplied SunTrust documents with the SunTrust name and logo, but then transmitted the information to GMM.  In some cases, it appears the borrowers were not informed of King's dual relationship, or that the personal financial information they had submitted to SunTrust would be routed to GMM.

30.     Wright assisted King and the others in this process.  On May 13, 2011, for example, Wright used her SunTrust email account to send a message to a SunTrust client with a copy to Podratsky's hotmail account.  She wrote the following:

> "Jim [Podratsky] also said that if you close with him at George
> Mason he can give you $1500 in closing cost help.  I let him know

9

that you are not ready to put a offer on that house just yet and we would let him know. It doesn't really matter if we submit contract with one lender and close with another. We would get you the letter from which ever source would be the fastest, but will probably end up closing you with George Mason as that is the better deal for you."

31.     Podratsky then forwarded the email and pertinent client information to

Dogan, who at that time was still employed by SunTrust, so that she could provide

further assistance in closing the loan for GMM.

32.     Similarly, on June 8, 2011, Wright emailed Hale and Podratsky at GMM

and gave them advice on how to switch another client from SunTrust to GMM. She

wrote:

"Because of the situation and so many involved (Sharon, Rick, Mike O) [SunTrust employees] it would be my suggestion that you get a signed borrower's request to reassign the case number to George Mason. This will cut through all the red tape that seems to be going up around here. To my understanding of FHA guidelines, if a borrower's sends a signed request it must be followed or the lender gets in some deep do-do."

33.     Clearly, Wright is asking Hale and Podratsky to proceed with caution

concerning the diversion of this client. She is suggesting that since so many SunTrust

employees are already involved in processing this particular application, GMM needs to

secure the client's consent to switch the loan.

34.     Without question, Wright was involved in diverting some of SunTrust's

clients, and she and others played a key role in stealing SunTrust confidential information

(as detailed below), but it was King who was the most prolific and brazen of the co-

conspirators, and it was this audacity that would eventually result in SunTrust's discovery

of the plot. For example, despite having a secure GMM email account, King apparently

found it advantageous on several occasions to use her SunTrust account to communicate,

both with the borrowers and with Podratsky, Rogers, and the other Defendants. This was due, in part, to her desire to confuse borrowers about her true loyalties and which entity would actually be providing the mortgage services being sought. Consequently, SunTrust has now recovered many of her emails, which paint a reasonably detailed picture of her efforts to convert SunTrust opportunities into GMM loans.

35.     The information immediately below details King's efforts with some, but not all, of the loan applicants she diverted or attempted to divert to GMM. To protect the privacy interests of the borrowers, they are identified only by initials.

36.     Clients DMH: Clients DMH were listed on King's most recent pipeline report, but on June 17, 2011, King reported to SunTrust that these clients had withdrawn their loan application. It is clear from the following sequence of emails, however, that King diverted the business to GMM.

- May 25, 2011: Using her SunTrust email address, King corresponds with Clients DMH concerning their loan application, asking the clients to complete a Uniform Residential Loan Application and related documents necessary to lock in their rate. King's email signature is "Alicia S. King, Senior Loan Officer, SunTrust Mortgage, Inc."

- May 27, 2011: Clients DMH return the completed paperwork to King at her SunTrust email address. The completed paperwork includes not only the Uniform Residential Loan Application, but a SunTrust Appraisal Report Disclosure, a SunTrust Additional Credit and Debt Disclosure, a Social Security Administration Authorization stating that the clients are "seeking a mortgage from the Company" and identifying the Company as

"SunTrust Mortgage, Inc.", and various other documents identifying SunTrust as the lender.

- June 8, 2011:  King, using her SunTrust email address, forwards an updated version of Client DMH's Universal Residential Loan Application to Rogers and Podratsky at GMM, asking if GMM can "lock for 35."

- June 10, 2011:  King, using her SunTrust email address, inquires again of Podratsky and Rogers, asking if GMM has locked down a rate for the clients.

- June 15, 2011:  King, using her SunTrust email address, communicates with the clients, informing them that she will send new paperwork the following day.  That same day, in another email, King again requests rates from Podratsky for Clients DMH and one other client.  Podratsky provides the GMM rates, but is momentarily confused, believing King is actually referring to yet another client that she is flipping from SunTrust to GMM.

- June 17, 2011:  King reports to SunTrust that Clients DMH have had to withdraw their loan "due to borrower not winning contract."  According to King's own records, she never submitted the clients' file to processing.

- June 27, 2011:  King receives notice of the bank's approval for the transaction contemplated by Clients DMH.  The notice is sent to King at her SunTrust email address, and she in turn forwards it directly to Rogers and to her own GMM email address, aking@gmmllc.com.  She can barely contain her enthusiasm for the securing the switch from SunTrust to GMM, writing only the following in her message "WHOO HOOOO!"

That same day, King sends another message to Rogers asking him to lock in a rate for Clients DMH, and she refers to four other clients she is flipping from SunTrust to GMM. Less than an hour later, Rogers confirms that he has locked in a rate for Clients DHM.

37.    Clients JRK:  SunTrust has actually closed at least one prior loan for Clients JRK, but unknown to SunTrust there was another one in the works, which King pursued and routed to GMM.

- May 23, 2011:  Rogers (using his SunTrust email address, as he did not resign from SunTrust until May 31, 2011), forwards several loan application disclosure documents to Clients JRK for signature. He also requests that they provide him with paystubs, bank statements, and other financial information, and he informs them he will be working with them "throughout the process."

- May 24, 2011:  Clients JRK forward to King and Rogers (at their respective SunTrust email addresses) bank statements and other financial information in connection with their SunTrust loan application.

- June 10, 2011:  King, using her SunTrust email address, communicates with Podratsky and Rogers about Client JRK's application. King wants to know if GMM can again facilitate a switch from SunTrust to GMM, stating: "I also gave a file . . . to Sharon [Carter, of SunTrust] 2 weeks ago – it's flawless in every way 20 yr refi and I'd love to switch it over. Can you do 4.25% with no points?"

- June 27, 2011: King, using her SunTrust email address, forwards Client JRK's loan application to Podratsky and Rogers at GMM, stating that GMM needs to issue "a pre-approval letter ASAP for this client." King notes that she is "waiting for Rick to arrive to deliver my letter of resignation."

- June 27, 2011: King and Rogers exchange several emails on this afternoon prior to King's delivery of her resignation letter. At 2:07 p.m., Rogers emails King Client JRK's Approval Letter, instructing her to "sign it and send it away." Less than an hour later, King forwards a signed copy of the Approval Letter to Client JRK's realtor. King transmits the letter from her SunTrust email account, in which she is identified as a Senior Loan Officer for SunTrust Mortgage, Inc., but the Approval Letter itself is on GMM letterhead and signed by King, who therein identifies herself as a GMM Mortgage Banker.

38.　Client TT: Client TT's switch from SunTrust to GMM was also facilitated by King, and when the transfer was finalized King expressed satisfaction.

- June 8, 2011: King reports to Hale at GMM that she is working to get the case number and appraisal for Client TT released to GMM so that the Client can move her loan application from SunTrust to GMM. It appears that King intentionally switched Client TT's application to GMM and facilitated the transfer. In fact, in her email King notes that SunTrust has "lost a great client for both high deposit banking . . . and mortgage, but she [Client TT] has vowed to close all of her bank accounts."

- <u>June 8, 2011</u>: Just 45 minutes later, King learns that the Client TT case number has been transferred to GMM, despite SunTrust management's efforts to save the business. Her response is: "WHOOOOOOOOO HOOOOOOOOOOOOOOO !!!!!!!!!!!!!!!!" This is not the response of a SunTrust employee who is sorry to lose a client. Of course, King is aware that she has not lost a client. She has just switched lucrative business to GMM three weeks before her resignation from SunTrust.

- <u>June 9, 2011</u>: Hale sends an email to Roger and King asking for certain tasks to be done for Client TT's loan. King replies to Hale and Rogers by writing, "WOW TEAM GMM!"

- <u>June 9, 2011</u>: The following day, Podratsky informs her that GMM has closed the Client TT loan. King responds: "Wow Wow Wow on [Client TT]!"

39.    <u>Client MCT</u>:  King reported to SunTrust on June 17, 2011, that Client MCT had withdrawn. However, as noted below, King was still actively pursuing the loan for GMM at the time of her resignation on June 27, 2011.

- <u>June 13, 2011</u>: King, using her SunTrust email account, corresponds with Hale at GMM about various Client MCT documents needed for a closing. Hale asks King to ensure that Client MCT provides the documents required.

- <u>June 15, 2011</u>: Podratsky forwards King an email discussion among GMM employees Hale, Rogers, and Podratsky that contains information about the status of Client MCT's mortgage application. Later that same

day, Hale sends a list of outstanding items related to Client MCT's mortgage application to King (at SunTrust) and to Podratsky and Rogers (at GMM). Podratsky responds that King is taking care of certain items on the list, and later that day King continues to correspond via her SunTrust email account with GMM employees about Client MCT's closing. She also emails Client MCT asking for specific documents GMM will need to close the loan.

- June 16, 2011: Hale responds to an email from Client MCT and cc's King's SunTrust email address. Later that day, Rogers sends Client MCT an email asking her for a letter from her accountant and other information. He copies King at her SunTrust email address. Rogers updates Podratsky (at GMM) and King (at SunTrust) later that day.

- June 17, 2011: Using her SunTrust email account, King sends Client MCT an email asking for additional information regarding the appraisal.

- June 24, 2011: Hale sends Rogers (at GMM) and King (at SunTrust) an email providing an update on Client MCT's loan approval.

- June 27, 2011: Using her SunTrust email address, King sends Rogers a message stating that she has spoken to Client MCT and will call her with an update. Rogers then copies King (at SunTrust) on an email to Client MCT.

40.    Clients CCW: King also reported to SunTrust – again on June 17, 2011 – that Clients CCW had withdrawn their loan application because "borrower going w/ credit union." Yet, the very next day, as noted below, King is still corresponding with the

clients and advising them to send any questions to GMM.  King facilitated the diversion

of the client in the course of processing the loan.

- June 15, 2011:  King, using her SunTrust email account, sends an email to Clients CCW informing them that she is moving to GMM.  She explains that she is no longer satisfied with SunTrust's service.

- June 16, 2011:  King gives Clients CCW her GMM email address and explains that her SunTrust email will work until the following week.  She also explains that Rogers (who is at GMM at this time) will send over the new paperwork for them to fill out and begin the loan process.

- June 17, 2011:  Using her SunTrust email address, King forwards Clients CCW's 401K balance statements, pay stubs and W2s to Rogers.

- June 18, 2011:  King emails Clients CCW from her SunTrust Mortgage email address and tells them that she spent the day at her "new camp." (This admission proves that King actively worked out of GMM's offices before she resigned her employment with GMM.)  King advises Clients CCW to contact Mitch Rogers at GMM if they have any questions about their paperwork because King is going to be away on vacation.

41.    Client AC:  King also reported to SunTrust that Client AC had withdrawn

his loan application because he was "not looking any longer."  She was correct that he

was not looking for a mortgage any longer, because King had diverted his business to

GMM, which had successfully closed the loan.

- April 29, 2011: From her SunTrust email address, King writes Client AC to describes the necessary steps to complete the loan pre-approval process.

She and the client correspond over the subsequent ten days, and King answers many of his questions.  On May 18, 2011, King tells Client AC that working through the Fannie Mae process is taking longer than expected.

- May 31, 2011: King emails Podratsky at GMM and writes, "I forgot I sent you a loan that needs pre-approval last Fri.  Name is [Client AC].  Were you able to do this one?"

- June 1, 2011: Podratsky responds to King's email and tells her, "…we can get this to you right away."  The same day he sends King Client AC's preapproval letter on GMM letterhead.  King later describes Client AC as her "my very first GMM client."

42.    Clients WAM:  These clients are not listed on King's pipeline report, and thus it appears that King pursued the business for GMM for start to finish without ever disclosing the opportunity to SunTrust.

- June 10, 2011:  King, using her SunTrust email address, sends a Uniform Residential Loan Application for Clients WAM to Podratsky and Rogers.  She asks them to pull credit for the loan.  Podratsky says they will.  The same day, King sends Clients WAM an email with the following message: "I have accepted a position with a specialty mortgage company where the focus is directly and only on mortgage and customer service, rather than banking.  Their name is George Mason Mortgage, a company under the Cardinal Bank umbrella, *and over the past few weeks, they have closed loans for me in as little as 7 days from start to finish.*  Their rates are

identical to SunTrust, and their fees are better.  My former manager here at Suntrust AND my assistant, Mitch, have also accepted and begun positions there and I would LOVE your permission to service you with them until I begin on the 17th (next Friday).  I can send your file over there as quickly as you like, and I assure you that we will be able to close at a moment's notice and with none of the strict guidelines that the larger banks/lenders impose." (Emphasis added.)

- <u>June 13, 2011</u>:  King asks Podratsky and Rogers for a letter for Clients WAM to ratify by noon.  Rogers sends King the Client WAM pre-approval letter on GMM letterhead.  King subsequently sends the GMM pre-approval letter to Clients WAM using her SunTrust email address.  In the email she writes, "…it's difficult to get something rushed on a Friday afternoon when I haven't actually begun my position [at GMM]."  The same day Podratsky sends the clients' loan summary on GMM letterhead to King's SunTrust email address.

- <u>June 14, 2011</u>:  Using her SunTrust email account, King sends Clients WAM an email in response to a request for rates and fees.  She writes, "I am getting an estimate from George Mason so that you have something to see.  I can also close you within 1 week, no more than 2 and I am QUITE confident that no other lender can offer this at this time."  King sends a loan summary on GMM letterhead to Clients WAM later that day.

- **June 18, 2011**: King writes Clients WAM using her SunTrust email account to tell them she is leaving on vacation and that Podratsky and her assistant, Rogers, will follow up with them.

43.   **Client MC**:  King worked diligently to convert Client MC to GMM – going so far as to inform SunTrust that the client had withdrawn his application.  But King was unsuccessful, as Client MC expressed confusion about the circumstances of his loan and ultimately closed with SunTrust in July, following King's resignation.  Client MC contacted SunTrust several days after King's resignation and inquired why his loan with SunTrust had not been advanced.  In the course of investigating the matter, SunTrust confirmed that although Client MC's name was in its system, all of his personal financial information was missing.  Client MC expressed more confusion about this, stating that he has provided the information to King and also stating that he had had an appraisal done through GMM.

- **June 18, 2011**: King sends a message from her SunTrust e-mail account to the real estate broker for Client MC, telling him that if he needs "any new help, please give Jim [Podratsky] or Mitch [Rogers] a call… ." She provides the broker with their respective GMM email addresses and phone numbers.

- **June 23, 2011**: Hale copies King on an email that includes a GMM Rush Appraisal Request Form and supporting documentation for Client MC. Hale instructs the recipient to contact Rogers (at GMM) or King (at SunTrust) if he has any questions.

- <u>June 27, 2011</u>: Prior to submitting her resignation letter, King emails Rogers using her SunTrust email address asking him if he has sent Client MC's documents.  Rogers replies that he has not because he has been "slammed busy with your files."  He also states that he "left a detailed email to your yahoo account that explained this."  King responds that Rogers should remember that "[Clients MC and LN] were the first priorities."  She also states that "there was the [Client MCT] letter, which I know was tuff, and an appraisal for [Client LN] that Donna [Hale] ordered."

- <u>June 27, 2011</u>:  Rogers sends the disclosures and appraisals for Client MC to King at her SunTrust email address. The attached loan summary statement, financing agreement, controlled business arrangement disclosure statement, certification, customer handbook on adjustable rate mortgages receipt, servicing disclosure statement, answers to truth-in-lending questions, disclosure of income, and borrower certification of pre-foreclosure or short sale were all prepared with the George Mason Mortgage Company heading.

44.    <u>Client LR</u>:  Client LR is another client that does not appear on King's pipeline report, although Client LR has closed loans with SunTrust in years' past.  Thus, the most recent opportunity with Client LR was never presented to SunTrust.

- <u>June 15, 2011</u>: Using her SunTrust email address, King responds to an inquiry by Client LR asking about financing for a second residence.  King tells Client LR that she is in the "midst of a transition because [she]

accepted a position with George Mason Mortgage."  King states that "over
the past few weeks, [GMM has] closed loans for me in as little as 7 days
from start to finish.  Their rates are identical to SunTrust, and their fees are
better."  King also tells Client LR that "[t]he customer service, turn times
for underwriting, appraisals, processing, etc., here at SunTrust Mortgage
have become a second priority, and subsequently, our office directly has
lost more than half of the staff."  King states that her "former manager
here at SunTrust AND [her] assistant, Mitch, have also accepted and
begun positions there and I would LOVE your permission to get you an
estimate with them when I officially begin (Friday)."  King provides
Client LR her GMM email address and phone number.

- June 24, 2011:  Using her SunTrust email account, King forwards Client
  LR's year 2010 paystub to lguevarez@gmmllc.com.  The domain
  "gmmllc.com" indicates the email address is for an employee of GMM.
  King also sends Client LR a breakdown of her monthly payments based on
  the estimated loan amounts.  The same day, Client LR sends an email to
  King at her SunTrust address asking her to forward a prequalification
  letter to her realtor.

- June 27, 2011:  King sent Client LR's preapproval documents to Rogers
  and Podratsky using her SunTrust Mortgage email account.  She states that
  she will try to work on the preapproval letter herself and that the letter is
  needed by the next day.  King also provides the password so that Rogers

and Podratsky can open the attached Uniform Residential Loan

Application for Client LR.

45.     Client EB:  On June 17, 2011, King informed SunTrust that this client had

withdrawn and was no longer interested in a mortgage; however, a week later, King

forwarded the loan application from SunTrust to her own GMM email address.

- June 10, 2011:  Using her SunTrust email account, King forwards Client
  EB's 2009 tax returns to Rogers at GMM.  In the email, King references
  Client EB's status and writes the following to Rogers: "Should be
  approved soon – the short sale that is! HA! Put these in my file please!"
  (The fact that King had an active "file" at GMM further establishes the
  Defendants' level of coordination and planning in furtherance of their
  conspiracy.)
- June 24, 2011:  From her SunTrust email account, King sends Client EB's
  Uniform Residential Loan Application to her own GMM email address.

46.     King's solicited and diverted, or attempted to divert, several other

customers before she submitted her resignation to SunTrust.

47.     For example, on June 8, 2011, King informed Client LN about her switch

to GMM and asked him not to share the information because she had not yet made an

announcement.  Despite this, she said she could lock in his mortgage with GMM

"immediately."  A week later (almost two weeks before her resignation) she asked

Podratsky to lock in favorable terms for Client LN at GMM.

48.     On June 16, 2011, King informed client JP that she had accepted a

position with George Mason Mortgage, and she explained that her former SunTrust

manager, her assistant, processors and closers have already begun to work for GMM and "have been able to close 2 loans for me within 7 days from start to finish." King writes "[t]he rates are identical to Suntrust and the fees are better." She states, "I hope that you will follow me on my journey and let me show you what George Mason Mortgage can do for you!"

49.     On June 13, 2011, Sandra Bailey, a loan closer for SunTrust, sent a Settlement Statement for Client AK to King's SunTrust email address. Within ten minutes of receiving the Settlement Statement, King forwarded the document to Rogers at GMM with the message "Final HUD." Four days later King informed SunTrust that Client AK had withdrawn.

50.     GMM approved Client RDC for a $500,000 loan with GMM on June 8, 2011. In the June 8, 2011, cover email attaching the pre-approval letter, Podratsky wrote: "Good luck with the house hunting and either I or Alicia will be happy to assist with any of your needs." He copied King on the email. Clients RDC had been listed on King's pipeline report, but King listed them as "withdrawn" on June 17, 2011.

51.     In addition to diverting clients, King worked to divert referral sources, such as realtors and brokers. For example, on June 8, 2011, she was invited by Mark Miller at EdwardJones to come to a business networking meeting the next day. King responded that she would love to come, but that she could not make it. Instead of proposing that another SunTrust employee accept the invitation, she proposed that Rogers (who was employed by GMM at this time) take the spot, writing: "I have teamed up w/a young man named Mitch Rogers, who would absolutely LOVE to come next week and apply for the spot. He and I back each other up, so on days he can't make it, I fill in for

him ;-).") King's language – that she had "teamed up" with Rogers and that they "back each other up" – is telling, as it betrays the conspiratorial and coordinated nature of their plan.

52.     There can be no question that the Defendants knew their actions were improper. They acted intentionally and deliberately, and they made efforts (though deficient ones, in the end) to cover their tracks. In fact, on June 16, 2011, King sent several identical emails to several SunTrust clients and referral sources asking them to contact her on her personal cell phone instead of the smartphone SunTrust had provided her, purportedly because it had become "disabled." However, when two of the recipients of King's email responded, King wrote back:

> "Pffstt .........this is also because I've switch [sic] employers as
> of tomorrow, but I can't tell SunTrust til next Wednesday.
> Hehehee.  Shhhhh......... Unless they are scanning my emails.
> Ha!"

53.     Although SunTrust was not "scanning" King's emails, King apparently was unaware that email messages from her SunTrust email account were being preserved automatically for a brief period on the SunTrust server. Furthermore, this email reflects, again, King's understanding that part of the plan was for her to work actively, even officially, for GMM *before* resigning from SunTrust.

**On behalf of her co-conspirators, King maligns SunTrust.**

54.     Throughout this period, in addition to actively diverting SunTrust lending opportunities to her cohorts at GMM, King did not miss a chance to malign SunTrust generally – again as part of the Defendants' plan to damage SunTrust's business.  On June 10, 2011, for example, King sent a message to a former client informing him that she has accepted a position with GMM.  She wrote:

> "As with your loan, I am exhausted with SunTrust's tight guidelines and am moving to this company because if a loan makes sense, they'll do it.  They also have better rates and fees and in my opinion, the client stays in the center of the room at all time."

55.     She sent a similar message to another client three days later:

> "Suntrust has gotten too big, as have all the other lenders, and in today's market, I need a smaller company, where I can pick up the phone and speak w/the underwriter or call in a favor and NOT reach another country or someone whom I've never met.  I sure hope you will allow me to earn your business over there."

56.     In both cases, these emails originated at King's official SunTrust email account and went out over her SunTrust electronic signature.

**The Defendants misappropriate SunTrust's proprietary information.**

57.     As their departures from SunTrust approached, King and Wright took steps to appropriate for GMM as much SunTrust proprietary information as they could.  For example:

   a) On June 24, 2011 – the Friday before her Monday resignation – King sent to her GMM email address Uniform Residential Loan Applications which the following borrowers had submitted to SunTrust:

   - Client BJD – Loan Amount $426,000
   - Client VB – Loan Amount $412,000
   - Client JB – Loan Amount $328,652

- Client JC – Loan Amount $403,000
- Client PH – Loan Amount $138,000
- Clients ASD – Loan Amount $246,700
- Client CD – Loan Amount $200,000
- Clients BKD – Loan Amount $ 300,000

None of these borrowers was listed on King's pipeline report, though some had applied for loans with SunTrust in years' past. Also on June 24, 2011, King forwarded other files and borrower-specific information for at least four other clients, some of which were on her pipeline report. All these transmissions occurred between 5:57 p.m. and 6:11 p.m. on a Friday evening. This information is in addition to the other applications and borrower-specific information discussed above. King also took hard copy files related to all but one of these borrowers.

b) On June 27, 2011 – before submitting her resignation letter – King sent a loan discussion summary for a client to her GMM email account with a copy to Rogers, noting that the client had just written a contract on the prior Saturday.

c) The same day, using her SunTrust email account, King sent a list of all the loans Podratsky had received during his SunTrust tenure to her GMM email account.

58.     But King did not stop with emailing client information and client lists to herself. With Wright's assistance, King downloaded proprietary SunTrust information, which she took with her to GMM, where she has presumably shared it with other GMM employees. On June 27, 2011, at 1:26 p.m., just before she delivered her resignation letter, King wrote and email to Wright stating: "Today is my last day. Do you have time

to show me how to download that info to a flash drive?  I'm desperate!"  In response,

Wright instructed King to bring her laptop and thumb drive to Wright's office.  King

wrote back: "Won't folks ask what we are doing????  HA.  Can we shut the door?"

Wright responded: "Yes we can shut the door and nobody cares what we are doing."

Finally, at 2:54 p.m., just before notifying her boss of her resignation, King emailed

Rogers, writing:  SHEWWWW ……….. I just finished downloading my data to my flash

drive.  SHEESH!  Now, I am taking letter to Rick. :-Q"  "Rick" refers to Rick Munch,

King's direct supervisor.

     59.     SunTrust's analysis shows that King inserted a ScanDisk Cruzer USB

device into her laptop at 2:04 p.m. on June 27, 2011.  Starting at 2:05 p.m., King accessed

files from her "My Documents" and "Desktop" folders in several blocks of time.  Groups

of files were "touched" – *i.e.* marked with a cursor and highlighted – at exactly the same

time, down to the second, indicating that King tagged several files at once and copied

them to the USB device.  One of those files, entitled "Master list.xls", was accessed from

the USB device itself after it was downloaded.  In all, it appears that King accessed as

many as 79 individual documents in this fashion.

     60.     The Excel spreadsheet entitled "Master list.xls" contained client names,

loan amounts, phone numbers and email addresses.  She also downloaded documents

related to scores of clients and accounts, including email messages, contracts, appraisals,

approval letters, loan information, and referrals, as well as borrowers' personal financial

information.

     61.     In addition, when King returned to the office two days after her

resignation to collect her personal belongings, she also took several hard copy client files,

though it is not yet clear just which files she removed.  She was told at the time that the files contained SunTrust customer information and belonged to SunTrust, not her, but she became angry and belligerent, eventually grabbing the files off the desk and storming out of the office.

62.     Following King's departure, SunTrust determined that at least twenty separate borrowers listed on King's pipeline report did not have correlating hard copy files, though it would have been standard practice for King to have created such files. Many of these "missing" files were related to the specific borrowers discussed above and many that were listed on King's "pipeline" list of active loans-in-progress.

63.     SunTrust later learned that King had taken even more files of which SunTrust had not been aware initially.  In early July, SunTrust made repeated demands for King to return the files and any other SunTrust records in her possession.  King stated that she had taken only one SunTrust file and claimed that the other files belonged to her, asserting that the customers were hers, not SunTrust's.  Finally, in mid-July (approximately July 12) King delivered a box of documents to SunTrust.  The box contained ten loan applications and eleven files related to nineteen different borrowers; however, of the twenty borrowers for whom information was missing, files related to only four of those borrowers were include in the box of returned files.

64.     King also removed a list called a "Continuity List" and her 2010 roster as well.  Both of these items are important for identifying clients and securing repeat business, and neither has been returned.  The Continuity List is particularly important because it is an integral component of SunTrust's marketing campaigns.

65.     King did not act alone.  As described above, Wright played an integral role in this scheme by assisting King in downloading SunTrust's proprietary information. But additionally, Wright herself accessed a number of critical files on her final day – June 30, 2011 – in a manner that suggests she downloaded the files to an external storage device just as King had done.  Specifically, Wright inserted a USB Flash Memory drive into her laptop at 9:50 a.m. on June 30, 2011.  She inserted a Kingston Data Traveler at 10:37 a.m. the same day.  During these periods she accessed and apparently copied several important documents, including her final pipeline report, a document called "processing status last day" and a file named "Fidelity Refip" that remains unreadable to SunTrust.  Additionally, a filed called "eMagic Trio submissions.doc" was also downloaded.  This file includes data from individual borrowers and specific loan numbers.

66.     Dogan was part of the scheme as well.  Although she remained employed at SunTrust until June 1, 2011, Dogan had frequent communications with Podratsky after Podratsky had begun work for GMM.  The two communicated about offers of employment GMM would be making to other SunTrust employees, about certain training necessary for Dogan to move to GMM, and about specific clients.

67.     On May 31, 2011, her last day with SunTrust, Dogan forwarded information related to at least eight separate SunTrust clients to her personal gmail account.  She also sent a document titled "Key Targets.xls" with a list of names and contact information of potential referral sources and clients.  The day after her resignation – June 1, 2011 – she illicitly logged into SunTrust's server and again forwarded

information related to two more SunTrust clients, as well as SunTrust's Mid-Atlantic

Pipeline Report.

**King resigns.**

68.     King did not notify SunTrust of her resignation until late in the afternoon

of June 27, 2011, when she delivered a resignation letter to her immediate supervisor.

Shortly thereafter, she transmitted an email to several other SunTrust employees, clients

and referral sources that she had resigned.

69.     Shortly before delivering her resignation letter, and still using her

SunTrust email, King wrote to Podratsky and Rogers:

> "LET'S GET READY TO RUMMMBBBBLLLLEEEEe!!!!!!!!!!
> I have several more VERY nice things coming!  Also just got the
> short sale approval on [Client DMH].  I will watch Mitch lock this
> one when I get there!"

70.     The email message confirms that at the time of her resignation, King had

several more loans in the works that she had diverted from SunTrust and would seek to

close at GMM.

**King and Dogan access SunTrust's computer network without authorization.**

71.     King departed SunTrust's offices late in the afternoon of June 27, 2011,

having submitted her resignation.  That same afternoon, she went to GMM's offices.

72.     Perhaps emboldened by her successful subterfuge and conversion of

SunTrust's business opportunities and information, King remotely accessed the SunTrust

network and her SunTrust email account the following day – June 28, 2011 – through a

web access portal.  On eleven separate occasions that day, King accessed SunTrust's

network and her email account.  On one occasion, she responded to an email from a

Capital One mortgage consultant that was sent to her SunTrust account, and in the course

of this exchange she discussed a SunTrust client's ability to qualify for a mortgage. Another time she used her SunTrust email to correspond with a SunTrust client and to inform the client to use her GMM email.  On yet another occasion, she accessed SunTrust's system to respond to an inquiry from a real estate broker and to decline an invitation to an open house.  King clearly knew that her access of the SunTrust network was unauthorized, as before any of these exchanges she tested her login and, when she found that it worked, emailed a SunTrust confidante:  "HAAAA!  They're dumb----I can still log in!"

73.    Dogan took similar action on June 1, the day following her resignation, when she accessed the SunTrust system at least five times, twice to send emails from her SunTrust account and three times to access and forward SunTrust client information to her gmail account.

**King violates the Lanham Act.**

74.    Part of the Defendants' conspiracy called for King to stay at SunTrust for weeks following the other Defendants' departures, in part to steer SunTrust clients and opportunities to GMM and in part to secure access to and steal SunTrust's proprietary information, including the borrower list that Podratsky inadvertently forgot to steal himself.

75.    But part of their plan also called for King to confuse borrowers and referral sources as to her true loyalties.

76.    In general, King's entire course of conduct throughout late May and early June was intended to blur the line between her role at SunTrust and her role at GMM. She repeatedly used her SunTrust email account, title and electronic signature bloc to

communicate with clients; she used SunTrust loan applications and forms containing the

SunTrust name and logo to commence the paperwork process; she would email this

information to GMM; and she would eventually deliver herself, or direct someone at

GMM to deliver, GMM approval paperwork.  The allegations above in connection with

specific client diversions bear this out, but other aspects of her conduct make her plan

even more clear.

77.     For example, on June 10, 2011, King sent an email to Ryan Rice, a realtor

and referral source, from her SunTrust email account, which identified her as a SunTrust

Mortgage "Senior Loan Officer."  Appended to the email was a SunTrust loan

application, which was marked at the top with the "SunTrust Mortgage" name and logo.

In the email message, King noted:  "Attached is the loan app that you should feel free to

pass along to clients who want to get a head start."  In her email message, however, King

provided Rice her GMM telephone number and GMM email address.  King was

interested in securing loan applicants for GMM, but she intentionally chose to provide

Rice a loan application with the SunTrust name and logo, even though she had had access

to GMM's secure email server for at least ten days at this time.

78.     With this email message, King was intending to solicit clients through

Rice for GMM – not for SunTrust.  However, by using her SunTrust email account, her

SunTrust email address, and in particular a loan application that prominently displayed

the SunTrust name and logo, King intended to cause confusion among borrowers and

referral sources, and to deceive them, with regard to her true affiliation and connection

with SunTrust and GMM and with regard to the origin of the mortgage loan services she

was marketing.   By asking Rice to distribute a SunTrust Mortgage loan application

instead of a GMM loan application, King intentionally sought to use the good name and reputation of SunTrust Mortgage – a well-known and well-established presence in the mortgage loan market – to solicit clients for GMM.  She intended for clients to complete the SunTrust loan application and return it to her directly or through Rice and then pursue the business through GMM.

79.     Client MC, discussed above, was confused when talking to SunTrust about the status of his loan.  Several days after King had resigned from SunTrust he was upset that he could not get hold of her.  Client MC was also confused as to why he had had his appraisal conducted through GMM when he was pursuing a home mortgage loan with SunTrust.

80.     King took other steps intended to create confusion among borrowers and referral sources.  For example, in June King began using the personal email address "suntrustalicia@yahoo.com."  King recognized that an email address that used the "SunTrust" name – but that was not affiliated with SunTrust (that is, that did not direct messages to the SunTrust server) – accomplished two important goals.  First, it gave borrowers and referral sources the impression that she was working on behalf of SunTrust when in fact she was attempting to secure business for the smaller and much-less-known GMM.  Second, it kept email messages hidden from SunTrust's view.

81.     The extent of business that the Defendants successfully converted from SunTrust to GMM is not clear at this point, but SunTrust's investigation is continuing.  At this time, it appears that King and the other Defendants have converted, attempted to convert, or forwarded confidential information related to, loans with a face value of nearly $4,000,000.  How successful GMM has been in closing these loans is still

unknown.  Still, it is clear that the Defendants' conduct was not incidental or accidental,
and it certainly did not occur by happenstance.  They engaged in a coordinated plan to
steal proprietary information, usurp business opportunities, and harm SunTrust's
business.

82.     Additionally, it is worth noting that King herself seemed thrilled with the
number and quality of the loans she was able to divert.  Already on June 8, 2011, three
weeks before her resignation, King emails Podratsky: "OMG ---- I'ts [sic] raining short
sale approvals . . . . . . . NICE ones with good clients!!!!  This is groove that I needed to
feel to leave with a clean heart."  Of course, the short sales she refers to in this email
were not sales being closed by SunTrust, but by GMM with King's assistance.  On June
28, 2011, King used her SunTrust email account to communicate with a SunTrust client.
She informed the client that her GMM "team began 4 weeks ago and [they] have closed 5
loans for me all in under 10 days."  King's words are important, in that she refers to the
GMM employees as her "team," betraying the conspiratorial nature of their enterprise.

## CAUSES OF ACTION

### COUNT I
### Conspiracy to Injure Another In Trade of Business
### [Va. Code §§ 18.2-499 and 18.2-500]
### (All Defendants)

83.     SunTrust incorporates by reference paragraphs 1-82 as if fully set forth
herein.

84.     Defendants acted in concert, agreed, associated, mutually undertook and
combined together to willfully and maliciously injure SunTrust in its business, reputation,
and trade.

85.     Defendants, all former employees of SunTrust, agreed on a plan pursuant to which some of the Defendants would resign from SunTrust and become established in the GMM Gainesville office, while other Defendants would remain at SunTrust for several weeks for the purpose of, among other things: diverting business opportunities and clients from SunTrust to GMM, misappropriating and converting SunTrust's proprietary business information and trade secrets; maintaining illicit and unauthorized access to SunTrust's computer network; utilizing SunTrust's name, reputation, logo and trademarks to divert business opportunities and clients to GMM; and using their SunTrust positions and titles to malign SunTrust's name and reputation.

86.     Defendants engaged in this conduct intentionally, purposefully, and without lawful justification.

87.     SunTrust has been, and will continue to be, injured in its business, reputation, and trade as a result of Defendants' activities.

88.     Pursuant to Va. Code §18.2-500, SunTrust is entitled to an injunction, three-fold its damages, punitive damages, and an award of its attorneys' fees and costs.

### COUNT II
### Common Law Conspiracy
### (All Defendants)

89.     SunTrust incorporates by reference paragraphs 1-82 as if fully set forth herein.

90.     Defendants acted in concert, agreed, associated, mutually understood and combined together for the purpose of willfully and maliciously injuring SunTrust in its business, reputation, trade and profession, including through the individual Defendants' breaches of their fiduciary duties, breaches of their contractual obligations, diversion of

business opportunities and clients from SunTrust to GMM, misappropriation and

conversion of SunTrust's proprietary business information and trade secrets; maintenance

of illicit and unauthorized access to SunTrust's computer network; utilization of

SunTrust's name, reputation, logo and trademarks to divert business opportunities and

clients to GMM; and use of their SunTrust positions and titles to malign SunTrust's name

and reputation.

91.    Defendants, by their aforementioned acts, acted intentionally,

purposefully, without legal justification and with legal malice toward SunTrust.

92.    SunTrust has suffered, and will continue to suffer, damages as a direct and

proximate result of Defendants' conspiratorial activities.

## COUNT III
### Breach of Fiduciary Duty
### (King, Podratsky, Rogers, Wright, Dogan)

93.    SunTrust incorporates by reference paragraphs 1-82 as if fully set forth

herein.

94.    Each of the Defendants King, Podratsky, Rogers, Wright and Dogan owed

a duty of loyalty to SunTrust during his or her employment.

95.    Each of the Defendants King, Podratsky, Rogers, Wright and Dogan has

breached his or her fiduciary duty by the conduct described herein.

96.    Each of the Defendants King, Podratsky, Rogers, Wright and Dogan

breached that duty of loyalty by taking steps to aid a competitor, GMM, during the course

of their SunTrust employment.

97.    Each of the Defendants King, Podratsky, Rogers, Wright and Dogan

breached his or her duty of loyalty to SunTrust by one or more of the following: diverting

business opportunities and clients from SunTrust to GMM, misappropriating and converting SunTrust's proprietary business information and trade secrets; maintaining illicit and unauthorized access to SunTrust's computer network; utilizing SunTrust's name, reputation, logo and trademarks to divert business opportunities and clients to GMM; using their SunTrust positions and titles to malign SunTrust's name and reputation; failing to devote their full business time to SunTrust; engaging in competing business activity directly related to the business of SunTrust while employed by SunTrust; soliciting other SunTrust employees to leave their SunTrust employment; and by other conduct described herein.

98.     Additionally, Podratsky breached his fiduciary duty when, while he was still employed by SunTrust, he solicited other SunTrust employees to resign their employment and work for him at GMM.

99.     SunTrust has been damaged by these breaches of fiduciary duty.

## COUNT IV
## Tortious Inducement of Breach of Fiduciary Duty
## (All Defendants)

100.     SunTrust incorporates by reference paragraphs 1-82 as if fully set forth herein.

101.     SunTrust was owed a fiduciary duty by each of the individual Defendants during the course of their SunTrust employment.

102.     Each of the individual Defendants, as well as GMM, were aware of the existence of these fiduciary duties.

103.     Despite their knowledge of these fiduciary duties, each of the Defendants, including GMM, tortiously induced, encouraged and solicited other of the individual

Defendants to breach these fiduciary duties by the conduct described herein, including but not limited to: diverting business opportunities and clients from SunTrust to GMM, misappropriating and converting SunTrust's proprietary business information and trade secrets; maintaining illicit and unauthorized access to SunTrust's computer network; utilizing SunTrust's name, reputation, logo and trademarks to divert business opportunities and clients to GMM; using their SunTrust positions and titles to malign SunTrust's name and reputation; failing to devote their full business time to SunTrust; engaging in competing business activity directly related to the business of SunTrust while employed by SunTrust; soliciting other SunTrust employees to leave their SunTrust employment; and by other conduct described herein.

104.    SunTrust has suffered, and will continue to suffer, damages as a result of the Defendants' tortious inducement of these breaches of fiduciary duties.

**COUNT V**
**Breach of Contract**
**(All Individual Defendants)**

105.    SunTrust incorporates by reference paragraphs 1-82 as if fully set forth herein.

106.    Each of the individual Defendants owed SunTrust contractual obligations not to use or disclose SunTrust's confidential and proprietary business information except in the course of conducting SunTrust business; not to work for any other company while employed by SunTrust; and not to take corporate opportunities that should be presented to SunTrust.

107.    Specifically, each of the individual Defendants signed employment applications containing a contractual promise not to use or disclose confidential SunTrust

information and not to work for any other company during their SunTrust employment. Further, four of the individual Defendants (King, Wright, Rogers, Hale) executed offer letters in which they promised to comply with SunTrust's Code of Business Conduct and Ethics, and thus the offer letters incorporated the following terms:

    a. The individual Defendants may not disclose sensitive client information or sensitive company information to any third party;

    b. The individual Defendants may not use their association with SunTrust for personal gain;

    c. The individual Defendants may not engage in any business activity during their SunTrust employment "that competes with the business interests or activities of SunTrust";

    d. The individual Defendants may not "take for themselves, personally, opportunities that are discovered through the use of SunTrust property, information or position";

    e. The individual Defendants may not use SunTrust information, property , or their position, for personal gain; and

    f. The individual Defendants may not provide confidential or proprietary information to third parties.

108.   The individual Defendants' contractual obligations are valid and fully enforceable.

109.   Each of the individual Defendants has breached his or her contractual obligations by the conduct described herein.

110.    Specifically, the individual Defendants breached their contractual obligations by the conduct described herein and/or by being part of a conspiracy to enable such conduct, including but not limited to: diverting business opportunities and clients from SunTrust to GMM, misappropriating and converting SunTrust's proprietary business information and trade secrets; maintaining illicit and unauthorized access to SunTrust's computer network; utilizing SunTrust's name, reputation, logo and trademarks to divert business opportunities and clients to GMM; using their SunTrust positions and titles to malign SunTrust's name and reputation; failing to devote their full business time to SunTrust; engaging in competing business activity directly related to the business of SunTrust while employed by SunTrust; soliciting other SunTrust employees to leave their SunTrust employment; and by other conduct described herein.

111.    Defendants King and Wright breached their contractual obligations by working for GMM while they remained employed by SunTrust. On information and belief, the other individual Defendants engaged in similar activities.

112.    On information and belief, each of the Individual Defendants have breached the Agreement by interfering with SunTrust's business by soliciting SunTrust employees to resign from SunTrust and to become employed or engaged by GMM.

113.    SunTrust has been damaged by these breaches.

### COUNT VI
### Tortious Interference with Contracts
### (All Defendants)

114.    SunTrust incorporates by reference paragraphs 1-82 as if fully set forth herein.

115.   Each of the individual Defendants owed SunTrust valid and fully enforceable contractual obligations as set forth above.

116.   GMM and each of the individual Defendants was aware of the existence of these contractual obligations.

117.   Despite their knowledge of these contractual obligations, each of the Defendants intentionally interfered with, and continues to interfere with, these Agreements by aiding, abetting and encouraging the breach of the obligations thereunder.

118.   Each of the Defendants used improper means in interfering with these contractual obligations.

119.   Specifically, each of the Defendants interfered with the contractual obligations of the individual Defendants by the conduct described herein and/or by being part of a conspiracy to enable such conduct, including but not limited to:  encouraging other individual Defendants to divert business opportunities and clients from SunTrust to GMM, encouraging other individual Defendants to misappropriate and convert SunTrust's proprietary business information and trade secrets; encouraging other individual Defendants to maintain illicit and unauthorized access to SunTrust's computer network; encouraging other individual Defendants to utilize SunTrust's name, reputation, logo and trademarks to divert business opportunities and clients to GMM; encouraging other individual Defendants to use their SunTrust positions and titles to malign SunTrust's name and reputation; encouraging other individual Defendants to fail to devote their full business time to SunTrust; encouraging other individual Defendants to engage in competing business activity directly related to the business of SunTrust while employed by SunTrust; and by other conduct described herein.

120.    SunTrust has suffered, and will continue to suffer, damages as a result of this tortious interference with these contractual obligations.

121.    The Defendants' tortious interference with SunTrust's Agreements has caused, and will, unless enjoined by this Court, continue to cause, SunTrust immediate and irreparable injury.

### COUNT VII
### Tortious Interference with Business Relationships/Expectancies
### (All Defendants)

122.    SunTrust incorporates by reference paragraphs 1-82 as if fully set forth herein.

123.    SunTrust had ongoing business relationships and expectancies with its referral sources and borrowers, including but not limited to borrowers who were applying for mortgage loans.  SunTrust had a reasonable expectation of continued profitability of these ongoing business relationships.

124.    Defendants were aware of the ongoing business relationships and expectancies between SunTrust and its referral sources and borrowers.

125.    Despite their knowledge of the existence of these relationships and expectancies, Defendants have intentionally interfered with these relationships and expectancies by disrupting these relationships and expectancies and appropriating them for their own benefit.

126.    Such interference was carried out intentionally and willfully by improper means, as described herein, including but not limited to: breaching their contractual obligations to SunTrust; misappropriating and converting SunTrust's proprietary business information and trade secrets; maintaining illicit and unauthorized access to SunTrust's

computer network; utilizing SunTrust's name, reputation, logo and trademarks to divert

business opportunities and clients to GMM; using their SunTrust positions and titles to

malign SunTrust's name and reputation; failing to devote their full business time to

SunTrust; and by other conduct described herein.

127.    Specifically: King intentionally interfered with these  relationships and

expectancies by diverting these business relationships to GMM during her SunTrust

employment and by utilizing SunTrust's name, reputation, logo and trademarks in

connection with such diversion; Wright intentionally interfered with these  relationships

and expectancies by diverting these business relationships to GMM during her SunTrust

employment; GMM, Podratsky, Rogers, Dogan and Hale intentionally interfered with

these  relationships and expectancies by assisting King and Wright in connection with the

foregoing conduct and by taking steps to process the diverted business and convert it for

GMM's benefit.  All Defendants intentionally interfered with these expectancies by

knowingly and intentionally participating in a conspiracy to accomplish these goals.

128.    But for the intentional interference by Defendants, SunTrust would have

continued to benefit from ongoing business relationships and expectancies with its

borrowers and referral sources.

129.    SunTrust has suffered, and will continue to suffer, damages as a result of

Defendants' interference with SunTrust's business relationships and expectancies,

including the loss of the business generated from such business relationships and the loss

of goodwill.

130.    Defendants' conduct has caused and will, unless enjoined, continue to

cause SunTrust immediate and irreparable harm.

131.   Defendants' conduct was willful and done with malicious intent as to justify an award of punitive damages.

## COUNT VIII
### Tortious Interference with Business Relationships/Expectancies
### (Podratsky)

132.   SunTrust incorporates by reference paragraphs 1-82 as if fully set forth herein.

133.   SunTrust had ongoing business relationships with SunTrust employees in the Gainesville office.  SunTrust had a reasonable expectation that these business relationships would continue.

134.   Podratsky was aware of these ongoing business relationships between SunTrust and its employees.

135.   Despite his knowledge of the existence of these relationships, Podratsky intentionally interfered with these relationships by soliciting SunTrust employees to leave their employment and join Podratsky at GMM.

136.   Such interference was carried out intentionally and willfully by improper means, including through Podratsky's breach of his fiduciary duty, which he breached when he solicited his fellow SunTrust employees while he was still employed by SunTrust.

137.   But for the intentional interference by Podratsky, SunTrust would have continued to benefit from ongoing business relationships with its employees.

138.   SunTrust has suffered, and will continue to suffer, damages as a result of Podratsky's interference with SunTrust's business relationships with its employees.

139.   Podratsky's conduct has caused and will continue to cause SunTrust harm.

140.    Podratsky's conduct was willful and done with malicious intent as to justify an award of punitive damages.

## COUNT IX
## Misappropriation of Trade Secrets
## (All Defendants)

141.    SunTrust incorporates by reference paragraphs 1-82 as if fully set forth herein.

142.    SunTrust possesses numerous trade secrets to which the individual Defendants had access, including, without limitation:  marketing information and strategies, pricing information, information related to borrowers and referral sources. Such trade secrets were maintained in items such as the 2010 roster, lists of outstanding loans, continuity lists, client files and other information described herein.

143.    SunTrust takes reasonable steps to safeguard this information, including but not limited to requiring its employees to promise not to use such information or disclose it to third parties, and by implementing and enforcing the Information Security Policy.

144.    SunTrust's trade secret information is of significant independent economic value because it is not generally known to, and not readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure and/or use.

145.    Defendants acquired access to the foregoing trade secrets under circumstances giving rise to a duty to maintain their secrecy and/or limit their use. Specifically, all individual Defendants had contractual obligations not to use such information or disclose it to third parties; yet each individual Defendant did, in fact,

access and disclose such information, encourage such access and disclosure, and receive and use information knowing it had been improperly accessed and disclosed.

146.    Defendants used and disclosed some or all of the foregoing trade secrets without express or implied consent from SunTrust.

147.    Defendants had valid and enforceable contractual obligations not to use or disclose SunTrust's confidential information, including its trade secrets.

148.    Defendants' conduct as alleged in this Complaint constitutes actual and/or threatened misappropriation of trade secrets in violation of Virginia Code §§ 59.1-336 to 59.1-343.

149.    Defendants are liable for compensatory damages.

150.    SunTrust is entitled to injunctive relief for the actual or threatened misappropriation of its trade secrets.

151.    SunTrust is entitled to punitive damages and attorneys' fees due to Defendants' willful and malicious misappropriation of SunTrust's trade secrets.

152.    SunTrust has suffered, and will continue to suffer, damages as a direct and proximate result of Defendants' misappropriation of its trade secrets.

**COUNT X**
**Conversion**
**(All Defendants)**

153.    SunTrust incorporates by reference paragraphs 1-82 as if fully set forth herein.

154.    By virtue of their actions of using and receiving documents and other tangible things containing or constituting SunTrust's confidential information (including

information that does not meet the definition of "trade secret" under Virginia law),

Defendants have exerted dominion and ownership over SunTrust's personal property.

155.    Such personal property includes,  but is not limited to, the 2010 roster,

lists of outstanding loans, continuity lists, client files and other information described

herein.

156.    Defendants have no right of possession of SunTrust's property.

157.    Defendants' use of SunTrust's property has deprived SunTrust of the use

of its resources.

158.    Defendants intended to exercise and have exercised dominion and control

over SunTrust's property, in a manner inconsistent with SunTrust's rights to such

property.

159.    Defendants committed the foregoing actions with actual malice.

160.    SunTrust has suffered, and will continue to suffer, damages as a direct and

proximate result of Defendants' conversion of its property.

**COUNT XI**
**Federal Computer Fraud and Abuse Act**
**[18 U.S.C. §1030]**
**(Defendant George Mason Mortgage, King and Dogan)**

161.    SunTrust incorporates by reference paragraphs 1-82 as if fully set forth

herein.

162.    SunTrust is a "financial institution" as defined in 18 U.S.C. §1030(e)(4).

163.    SunTrust's computers used by King and Dogan while they were employed

by SunTrust are computers exclusively for the use of a financial institution and are used

in or affect interstate commerce and are thus "protected computers" under 18 U.S.C.

§1030(e)(2)(A) and (B).

164.    Once King and Dogan resigned their SunTrust employment, they were no longer authorized to access SunTrust's computers or the information contained on them.

165.    However, on several occasions following their resignations, King and Dogan accessed SunTrust's computers without authorization and/or exceeded their authorized access thereto, as described herein.  As a result of this unauthorized access, King and Dogan communicated with SunTrust's clients, potential clients and referral sources, and misappropriated additional confidential information, for the purpose of promoting their competing business with GMM.

166.    Their access to SunTrust's computers after their resignations resulted in their obtaining information contained in the financial records of SunTrust in violation of 18 U.S.C. §1030(a)(2).  Further, they accessed SunTrust's computers after their resignations with the intent to defraud, and in so doing they furthered their intended fraud and obtained valuable information regarding clients, potential clients and referral sources they would otherwise not have been able to obtain.  Thus, their unauthorized access was carried out in violation of 18 U.S.C. §1030(a)(4).

167.    King's and Dogan's access was knowing and intentionally fraudulent.  In King's case, this is established by her admission on June 28, 2011, when she expressed surprise by her ability to access the SunTrust network and called SunTrust managers "dumb" for failing to cut off her ability to log in remotely.

168.    King's and Dogan's conduct has resulted in a loss to SunTrust in excess of $5,000, which amount stems at least in part from SunTrust's dedication of resources to respond to their offense, conduct a damage assessment, and determine whether files or other information had been lost or compromised.

169.    At the time of their accessing SunTrust's computers without authorization, King and Dogan were acting as agents of, and co-conspirator with, GMM.

## COUNT XII
### Federal Unfair Competition
### [15 U.S.C. § 1125]
### (Defendants George Mason Mortgage and King)

170.    SunTrust incorporates by reference Paragraphs 1-82 as if fully set forth herein.

171.    King used loan applications, disclosure forms, and related documents, as well as her SunTrust email account and signature block, which contained the SunTrust name and logo, to solicit, secure, and process loans from SunTrust clients on behalf of GMM.  In addition, King created a fraudulent email address – suntrustalicia@yahoo.com – to further her illicit scheme.

172.    King's actions were likely to and had the effect of deceiving and causing confusion among borrowers, vendors, and referral sources as to the true nature of her relationship with SunTrust and GMM and as to the source of the mortgage services she was marketing.  King intended such deceit and confusion.

173.    Further, in carrying out her scheme, King willfully sought to trade on SunTrust's name and reputation.

174.    King's actions constitute unfair competition, false designation of origin, and false advertising, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

175.    In carrying out this scheme, King acted on behalf of, as an agent of , and with the full actual and/or constructive knowledge of GMM and its agents including Podratsky.

50

176.    Defendants' actions have caused, and will continue to cause, damages and irreparable harm to SunTrust unless permanently enjoined.

## COUNT XIII
### Unfair Competition
### (Defendants George Mason Mortgage and King)

177.    SunTrust incorporates by reference paragraphs 1-82 as if fully set forth herein.

178.    King, acting on behalf of and as an agent for GMM, made false statements about SunTrust's products and services, deceived borrowers and referral agents as to the true nature of her affiliation with SunTrust and GMM, and attempted to pass off GMM's products and services as those of SunTrust.

179.    This conduct constitutes an unfair method of competition.

180.    As a result of the foregoing, SunTrust has suffered and will continue to suffer damages.

## COUNT XIV
### Unjust Enrichment
### (All Defendants)

181.    SunTrust incorporates by reference paragraphs 1-82 as if fully set forth herein.

182.    Defendants' conduct described herein conferred a benefit on Defendants for which Defendants did not pay or provide other remuneration.

183.    Such benefit was conferred at the expense of SunTrust.

184.    Defendants appreciate and have knowledge of the benefit they received as a result of this conduct.

185.    The acceptance and retention by Defendants of this benefit without payment of its value is inequitable to SunTrust and constitutes an unjust enrichment to Defendants.

186.    Defendants acted with actual malice to obtain benefits from SunTrust without compensation to SunTrust.

187.    SunTrust has been damaged by Defendants' unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff SunTrust prays this Court to enter judgment in its favor and against Defendants and award it the following relief:

a.      Temporary injunctive relief against all Defendants ordering them to:

(i)     create itemized lists of all files, documents, and other information, whether in hard copy, electronic, or other format, that they, or any of them, collectively or individually:  (i) removed from SunTrust's premises; (ii) obtained from someone who removed them from SunTrust's premises; or (iii) have or have had possession of or access to at any time since their respective employment with SunTrust ended and that contain any of SunTrust's confidential or proprietary information or trade secrets or that they received from any other former SunTrust employee as a result of the conduct described herein;

(ii)    provide such lists to SunTrust;

(iii)   return to SunTrust all such files, documents and other information that are capable of being returned; and

(iv)    preserve, but not review, access, use or disclose, all such files, documents and other information that remain in their possession in electronic format,

until further order of the Court.

      b.     Preliminary and permanent injunctive relief against all Defendants, preventing Defendants from:

           (i)     using or disclosing any of SunTrust's confidential or proprietary information or trade secrets and ordering them to return any such information they find in their possession, custody or control that has not already been returned;

           (ii)     making false statements about SunTrust's business, products or services;

           (iii)     soliciting or hiring any SunTrust employees for a period until January 1, 2013; and

           (iv)     until January 13, 2013, soliciting or conducting business with any client or potential client (A) who was solicited by any of the individual Defendants during such individual Defendant's employment by SunTrust between April 1, 2011 and June 30, 2011; or (B) whose loan information was received by any of the Defendants as a result of the conduct described herein.

      c.     Compensatory damages in an amount to be determined at trial, with appropriate amounts trebled pursuant to all applicable laws, but not less than $500,000;

      d.     An accounting by Defendants of any profits received for the above-mentioned actions;

      e.     Disgorgement by Defendants of any profits they received for the above mentioned actions, and/or creation of a constructive trust for the benefit of SunTrust thereto;

      f.     Disgorgement by Defendants of salaries paid to them by SunTrust during

the period of their tortious conduct;

     g.     Punitive damages against each Defendant;

     h.     Prejudgment interest on all damages awarded;

     i.     SunTrust's reasonable costs and attorneys' fees; and

     j.     Such other legal and equitable relief as the Court may deem appropriate.

Respectfully submitted,

Michael J. Lorenger, VSB #38910
Susanne Harris Carnell, VSB #41521
LORENGER & CARNELL PLC
651 South Washington Street
Alexandria, VA  22314
Phone:  (703) 684-1808
Facsimile: (703) 684-1805
mlorenger@lorengercarnell.com

Counsel for SunTrust Mortgage, Inc.

## JURY DEMAND

Plaintiff demands a trial by jury of all causes of action contained herein.

Michael J. Lorenger
Counsel for Plaintiff