FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

2011 AUG -5  P 2: 27

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| **SUNTRUST MORTGAGE, INC.** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:11 CV 830 |
| | ) | |
| **GEORGE MASON MORTGAGE,** | ) | |
| **LLC, et al.** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION FOR EMERGENCY *EX PARTE* RELIEF AND A TEMPORARY RESTRAINING ORDER

Plaintiff, SunTrust Mortgage, Inc., (hereinafter, "SunTrust"), by and through its
undersigned counsel, submits this brief and attached exhibits in support of its Motion for
Emergency *Ex Parte* Relief and a Temporary Restraining Order.

### I.    Introduction

This action arises out of the coordinated effort by six of SunTrust's former
employees and the entity that now employs them, George Mason Mortgage, Inc. (herein
after, "GMM"), to divert SunTrust's business opportunities and steal its employees, trade
secrets and proprietary information.  All of the individual Defendants resigned from
SunTrust between May 12, 2011 and June 30, 2011.  Several of the individual
Defendants left in May 2011 to establish themselves in the Gainesville office of GMM,
while others remained at SunTrust until the end of June to ensure that they would retain
access to SunTrust's proprietary information and would be better positioned to divert
clients to GMM.  Over the course of approximately six weeks, the individuals that

remained employed by SunTrust – chiefly King – solicited borrowers and referral sources using their SunTrust positions, titles and email addresses, secured loan applications using SunTrust documents, and then repeatedly and surreptitiously routed those materials to their co-conspirators at GMM, where the loans were closed.

Additionally, SunTrust has uncovered incontrovertible proof that during their final days of employment with SunTrust: At least three of the employees emailed sensitive and proprietary business information to their personal email accounts or directly to GMM; two of the employees inserted removable flash drives into their laptops and downloaded a wealth of confidential business documents and specific borrower information; and two of the employees logged into SunTrust's network without authorization after their resignations to steal even more business information. The circumstances of these activities strongly suggest that this information was shared with the other of the individual Defendants and with GMM and has been used by all the Defendants to solicit and divert SunTrust customers to GMM.

The key players in this scheme are James Podratsky, the former Branch Manager of SunTrust's Gainesville office; Alicia King and Samantha Dogan, former SunTrust Loan Officers; Amber Wright and Donna Hale, former SunTrust Loan Processors; and Mitch Rogers, who worked for SunTrust as King's assistant. All six are now employed by GMM in its Gainesville office.

SunTrust has and will continue to suffer irreparable harm from these acts unless the Defendants are enjoined by the Court.

Although the Defendants' plan was far-reaching, SunTrust's request for temporary relief – at this stage – is not. As SunTrust's Complaint makes clear, the

Defendants engaged in conspiratorial conduct, repeatedly breached their fiduciary duties and their contractual obligations, tortiously interfered with SunTrust's business opportunities, misappropriated SunTrust's trade secrets, and committed violations of both the Federal Computer Fraud and Abuse Act and the Lanham Act. All of these violations will be examined and explored in detail as the case proceeds and will likely warrant the imposition of more extensive injunctive relief. For the time being, however, SunTrust seeks temporary *ex parte* relief in only one respect: Defendants must account for, itemize, preserve, and return to SunTrust the confidential business and borrower information they or their co-conspirators have acquired from or in connection with their employment at SunTrust.

## II.   **Background**

SunTrust originates and services home mortgage loans throughout the country, including Virginia. Its Loan Officers (such as King and Dogan) work closely with Loan Processors (such as Wright and Hale) to promote its mortgage loan business. Loan Officers identify and solicit potential borrowers and referral sources to provide SunTrust's services. They also analyze prospective borrower's financial information, counsel borrowers in the home buying and financing process, advise borrowers regarding clearing credit issues, counsel borrowers on the financial and long term impact of various loan products, and prequalify the borrowers for mortgage loans. In addition, they secure loan applications from borrowers, order appraisals, secure income documentation and other financial information, and essentially take all the steps necessary to assemble a complete loan application package on the borrower's behalf. The package is then submitted to a Loan Processor, who validates all the information and submits the loan

request to the underwriting department.  Some Loan Officers use assistants in connection

with their work.  *See* Exhibit 1, Declaration of B. Harris, at ¶4.

All of the individual Defendants once worked for SunTrust at its Gainesville

Branch.  Podratsky was the Branch Manager, and in that capacity was in charge of the

branch's day-to-day operations.  The other individual Defendants reported to him, either

directly or indirectly.  In May, Podratsky resigned to join the staff at GMM's branch

office in Gainesville.  Thereafter, Rogers, Hale and Dogan each resigned in May or early

June and started employment immediately at GMM.  King and Wright remained behind

at SunTrust for several additional weeks.  King eventually resigned on June 27, 2011, and

Wright resigned on June 30, 2011.

As the Complaint makes clear, these staggered departures were part of a scheme

by the Defendants to steal SunTrust clients, business opportunities, proprietary business

information and trade secrets.  The scheme allowed King and Wright to preserve their

access to SunTrust's proprietary information and potential clients while they steered

borrowers from SunTrust to GMM, where their co-conspirators would work to close the

loans and thus capture SunTrust's business opportunities.  Evidence of this plot was

uncovered in July when SunTrust began inspecting King's email files in connection with

its concern that she had failed to return a set of borrower files that were missing from her

office following her departure.  These emails are quoted extensively in the Complaint,

and SunTrust will provide copies for *in camera* inspection should the Court deem them

necessary for consideration of this motion.[1]  However, because the sole relief sought by

---

[1] The emails and other information cited in the Complaint and in this brief contain the names,
contact information, financial information and in some cases the Social Security Numbers of
individuals who have sought mortgage loans from SunTrust.  As such, the information is highly

this motion is an order directing the Defendants to account for, itemize, preserve and return the information they have stolen, SunTrust focuses solely on these issues here.

**III.    At least three of the Defendants misappropriated SunTrust's confidential and sensitive business information, including borrower information, under circumstances indicating they knew their actions were improper.**

The evidence that King, Wright and Dogan stole SunTrust's confidential and proprietary business information cannot be disputed.

### A.    Defendant King

On June 24, 2011 – the Friday before her Monday resignation – King sent to her GMM email address at least eight Uniform Residential Loan Applications that had been submitted to SunTrust.  On the same day, King forwarded other files and borrower-specific information for at least three additional clients.  All of these transmissions occurred between 5:57 p.m. and 6:11 p.m. on a Friday evening.  *See* Exhibit 2.  On June 27, 2011 – her final day at SunTrust – King sent a loan discussion summary for a client to her GMM email account with a copy to Rogers, noting that the client had just written a contract on the prior Saturday.  *See* Exhibit 3.  The same day, using her SunTrust email account, King sent Podratsky's "Continuity Report" – which is a marketing list of all the clients for whom Podratsky had written loans during his SunTrust tenure – to her GMM email account.  *See* Exhibit 4.  None of this information belongs to King.  The loan applications and other borrower information were submitted to SunTrust, not to King personally or to GMM; and of course SunTrust's client list, which is used for marketing purposes, is a critically and competitively sensitive document.

---

sensitive.  Where SunTrust has determined it necessary to attach some of this information to this brief, borrower-specific information has been redacted.

Also on her last day, King downloaded to a removable flash drive nearly 600 files and took the information with her to GMM. King's activities are detailed in the Declaration of Glenn Haywood, attached hereto as Exhibit 5. Mr. Haywood has performed a forensic inspection of King's and Wright's activities with their laptops in the final days of their employment, and he has performed a partial analysis of Dogan's activities. From Mr. Haywood's Declaration is it clear that:

- At 2:04 p.m. on June 27, 2011, King inserted a USB flash drive device into her laptop.

- She immediately accessed files from her "My Documents" and "Desktop" folders in several blocks of time. She highlighted several files at once and executed a process that is consistent with a copy command. In all, King accessed at least 79 separate files in this fashion.

- Much of the information King downloaded was specific to particular borrowers who had submitted information to SunTrust. She also copied other sensitive documents, including her "Pipeline Report" (an active customer list), documents identifying referral sources, specific customer contracts, and client credit information.

- King logged on again remotely, using Outlook Web Access, on June 28, 2011, the day after she had resigned.

*See* Haywood Decl. at ¶¶6-7.

King's illicit intent, as well as that of Wright, was made evident by an email exchange that occurred just before the activities described above. Specifically, King emailed Wright at 1:26 p.m., writing: "Today is my last day. Do you have time to show me how to download that info to a flash drive? I'm desperate!" At 1:40 p.m., Ms. Wright responded to the message, stating: "yep bring your laptop and thumb drive to me". King wrote back at 1:45 p.m.: "Won't folks ask what we are doing???? HA. Can we shut the door?" Wright responded at 1:46 p.m.: "Yes we can shut the door and nobody cares what we are doing." Finally, at 2:54 p.m., King emailed Mitch Rogers at

GMM, writing:  SHEWWWW ……….. I just finished downloading my data to my flash

drive.  SHEESH!  Now, I am taking letter to Rick. :-Q"  *See* Exhibit. 6.

In addition, when King returned to the office two days after her resignation to

collect her personal belongings, she took possession of several hard copy client files.  She

sought out and confronted Ms. Harris, who was reviewing SunTrust client files that had

been retrieved from King's office.  Although Harris informed King that client files are

SunTrust property and contain sensitive financial information related to SunTrust clients,

King protested that the files were hers and, after making a scene, literally grabbed the

files off Harris's desk and stormed out.

Following King's departure, SunTrust determined that at least twenty separate

borrowers listed on King's pipeline report did not have correlating hard copy files,

though it would have been standard practice for King to have created such files.  Many of

these "missing" files were related to the specific borrowers that were listed on King's

Pipeline Report of active loans-in-progress.  SunTrust later learned that King had taken

even more files of which SunTrust had not been aware initially.  Specifically, in mid-July

King delivered a box of documents to SunTrust in response to repeated demands by

SunTrust that they be returned.  The box contained ten loan applications and eleven files

related to nineteen individual borrowers who had loan applications in various states of

completion; however, of the twenty folders SunTrust had originally identified as missing,

only four were include in the box of returned files.  *See* Harris Decl. at ¶13.

**B.     Defendant Wright**

As described above, Wright played an integral role in this scheme by assisting

King in downloading SunTrust's proprietary information.  But additionally, Wright

herself accessed a number of critical files on her final day – June 30, 2011 – after having

inserted an external storage device, a flash drive, into her laptop. Specifically, Wright

inserted a USB Flash Memory drive into her laptop at 9:50 a.m. on June 30, 2011. She

inserted a Kingston Data Traveler at 10:37 a.m. the same day. During these periods she

accessed several important documents, including her final Pipeline Report, a document

called "processing status last day" and a file named "Fidelity Refip" that remains

unreadable to SunTrust. Additionally, a filed called "eMagic Trio submissions.doc." was

also downloaded. The forensics analysis shows that some of these files were accessed

after their transmission to the flash drives. This file includes important information

related to individual borrowers and specific loan numbers. *See* Haywood Decl. at ¶5.

### C. <u>Defendant Dogan</u>

Dogan was part of the scheme as well. On May 31, 2011, her last day with

SunTrust, Dogan forwarded information related to at least eight separate SunTrust clients

to her personal gmail account. She also sent a document titled "Key Targets.xls," which

included a list of names and contact information of highly valuable potential clients and

referral sources. The two days after her resignation – June 1 and 2 – she illicitly logged

into SunTrust's server and again forwarded information related to two more SunTrust

clients, as well as SunTrust's Mid-Atlantic Pipeline Report – another critical component

of SunTrust's marketing and business development planning. *See* Haywood Decl. at ¶8;

*see also* Exhibit 7.

**IV.   The Defendants who misappropriated SunTrust's confidential and sensitive business information shared that information with their co-Defendants in connection with a nearly seamless operation that blurred the lines between SunTrust and GMM.**

It is clear from the allegations contained in the Complaint, specifically the allegations at Paragraphs 36 to 51, that King worked diligently while she was still employed by SunTrust to divert borrowers from SunTrust to GMM.  She repeatedly solicited borrowers and referral sources using her SunTrust email address, then began the loan process using SunTrust loan applications, disclosures, waivers and other SunTrust documents, and finally concluded the business by routing the loan applications and paperwork to GMM, where she was assisted by the other Defendants in closing the loans.

It is equally clear that by remaining "inside" SunTrust, King and Wright were able to use SunTrust's confidential information – including the information supplied by borrowers looking to SunTrust for their mortgage – to maximize the impact of their scheme.  For example, on May 31, 2011, nearly a month before she would notify SunTrust of her own resignation, King (operating from inside SunTrust) emailed Podratsky (at GMM), and asked him if she should divert six specific borrowers to GMM:

> "I need your honest opinion as to whether you have the capacity to close these [home loans] so that the clients and agents aren't frustrated w/me.  If it's in everyone's best interests to close them here [at SunTrust], I can. Thanks Bossman!"

*See* Exhibit 8.  For each client identified, King supplied pertinent information about the loan, advised as to the target interest rate necessary for GMM to capture the business, or asked whether GMM had all the information it needed.  For one of these borrowers, King noted:

> "I MAY BE SWITCHING THIS FROM STM TO YOU TODAY!
> What rate can you get me with borrower paying 1.25 points for
> FHA high balance, credit scores 745, 15 day lock."

*See id.*

Wright assisted King and the others in this process. On May 13, 2011, for

example, Wright used her SunTrust email account to send a message to a SunTrust client

with a copy to Podratsky's hotmail account. She wrote the following:

> "Jim [Podratsky] also said that if you close with him at George Mason he
> can give you $1500 in closing cost help. I let him know that you are not
> ready to put a offer on that house just yet and we would let him know. It
> doesn't really matter if we submit contract with one lender and close with
> another. We would get you the letter from which ever source would be
> the fastest, but will probably end up closing you with George Mason as
> that is the better deal for you."

*See* Exhibit 9. Podratsky then forwarded the email and pertinent client information to

Dogan, who at that time was still employed by SunTrust.

What is particularly remarkable about the Defendants' actions is the coordinated

manner in which employees from competing companies worked as a team for one

company's benefit and the other's detriment. The following email messages, attached

collectively at Exhibit 10, reflect this coordination:[2]

- King emails Podratsky at GMM on May 31, 2011, writing: "I forgot I sent you
  a loan that needs pre-approval last Fri. Name is [Client AC]. Were you able
  to do this one?" Podratsky responds the next day: "...we can get this to you
  right away." The same day he sends King Client AC's preapproval letter on
  GMM letterhead. King later describes Client AC as her "very first GMM
  client."

- GMM approved Client RDC for a $500,000 loan with GMM on June 8, 2011.
  In the June 8, 2011, cover email attaching the pre-approval letter, Podratsky
  wrote: "Good luck with the house hunting and either I or Alicia will be happy
  to assist with any of your needs." He copied King on the email.

---

[2] To protect individual client identities, SunTrust identifies its clients here by initials only.

- On June 8, 2011, King, using her SunTrust email address, forwards an updated version of Client DMH's Universal Residential Loan Application to Rogers and Podratsky at GMM, asking if GMM can "lock for 35." Obviously, the client submitted the loan application to SunTrust, not GMM. Two weeks later, on June 27, 2011, when King receives notice of the bank's approval at her SunTrust email address, she forwards it directly to Rogers and to her own GMM email address, aking@gmmllc.com. That same day, King sends another message to Rogers asking him to lock in a rate for Clients DMH, and she refers to four other clients she is flipping from SunTrust to GMM.

- On June 10, 2011, King, using her SunTrust email address, communicates with Podratsky and Rogers at GMM about Client JRK's application. King wants to know if GMM can again facilitate a switch from SunTrust to GMM, stating: "I also gave a file . . . to Sharon [Carter, of SunTrust] 2 weeks ago – it's flawless in every way 20 yr refi and I'd love to switch it over. Can you do 4.25% with no points?"

- On June 13, 2011, King, using her SunTrust email address, corresponds with Hale at GMM about various Client MCT documents needed for a closing. Hale asks King to ensure that Client MCT provides the documents required. Two days later Podratsky forwards King an email discussion among GMM employees Hale, Rogers, and Podratsky that contains information about the status of Client MCT's mortgage application. Later that same day, Hale sends a list of outstanding items related to Client MCT's mortgage application to King (at SunTrust) and to Podratsky and Rogers (at GMM). Podratsky responds that King is taking care of certain items on the list, and later that day King continues to correspond via her SunTrust email account with GMM employees about Client MCT's closing.

- On June 18, 2011, King sends a message from her SunTrust e-mail account to the real estate broker for Client MC, telling him that if he needs "any new help, please give Jim [Podratsky] or Mitch [Rogers] a call... ." She provides the broker with their respective GMM email addresses and phone numbers. Less than a week later, Hale copies King on an email that includes a GMM Rush Appraisal Request Form and supporting documentation for Client MC. Hale instructs the recipient to contact Rogers (at GMM) or King (at SunTrust) if he has any questions.

- On June 28, 2011, King used her SunTrust email account to communicate with a SunTrust client. She informed the client that her GMM "team began 4 weeks ago and [they] have closed 5 loans for me all in under 10 days."

*See id.*

The import of this evidence is that *all* of the Defendants, including GMM acting through its agent, Podratsky, were part of the scheme and coordinated their actions accordingly.

**V.     The evidence strongly suggests that this plot was hatched in advance and that the Defendants' staggered departures from SunTrust were intended to enable King and Wright to divert SunTrust business opportunities and steal its proprietary data.**

The evidence strongly points to a coordinated plan by the Defendants. First, although King was officially offered employment by GMM with an offer letter dated May 17, 2011, only five days after Podratsky began working for GMM, King did not tender her resignation to SunTrust until June 27, 2011 – *more than forty days later. See* Exhibit 11, Offer Letter dated May 17, 2011. Second, as early as June 1, 2011 – *nearly a month before King tendered her resignation to SunTrust* – Podratsky authorized King to be granted access to the "George Mason Secure Email Message Center." King used this access to set up a secure GMM email address on GMM's server. *See* Exhibit 12. Later, she would email SunTrust documents from her SunTrust email account to her GMM email account, the address for which was "aking@gmmllc.com." *See, e.g.,* Exhibit 13; *see also* Exhibit 2. Third, on several occasions, King sent emails indicating that it was her intent to start working for GMM before she resigned from SunTrust, or suggesting that an overlapping working relationship had already begun. *See* Exhibit 14. In short, GMM gave King an active GMM email address to allow her to conduct business out of SunTrust's sight, but it delayed her start date to allow her time to steer SunTrust customers to GMM and to steal SunTrust's information.

Of course, King did not act alone in this. Wright also participated in this plot, as she herself directed clients to GMM while she was still employed by SunTrust. *See*

Exhibit 9. Further, as described above, Wright affirmatively assisted King in

downloading confidential and proprietary business information on King's last day of

employment. She did not express surprise or alarm that King had made such an illicit

request, but instead readily assisted her and then did the same thing herself on her last

day. Dogan took similar actions on her final day. And all of these Defendants shared

information with the other Defendants and GMM.

## LEGAL ARGUMENT

I.    **Legal Standard for Preliminary Injunctions and Temporary Restraining
      Orders.**

District courts have the discretion to grant temporary restraining orders and

preliminary relief prior to the adjudication of the underlying dispute. Federal Rule of

Civil Procedure 65; *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 78

(4th Cir. 1989). In granting such motions, courts require a showing of each of the

following four factors: (1) that the plaintiff is likely to succeed on the merits, (2) that the

plaintiff is likely to suffer irreparable harm in the absence of preliminary relief, (3) that

the balance of equities tips in the plaintiff's favor, and (4) that an injunction is in the

public interest. *The Real Truth About Obama, Inc. v. Federal Election Commission*, 575

F.3d 342, 346-47 (4th Cir. 2009). Moreover, when a motion for a temporary restraining

order under Rule 65 is set for hearing with notice to the opposing parties, the Court may

treat that motion as one for a preliminary injunction, thus securing the discretion to

extend the injunctive relief beyond the 10- or 20-day period provided for in Rule 65. *See*

*Ciena Corp. v. Jarrard*, 203 F.3d 312, 319-20 (4th Cir. 2000).

As discussed below, this case meets all the standards for temporary and/or

a preliminary injunctive relief.

**II.     SunTrust Will Suffer Irreparable Harm If The Court Does Not Enjoin The Defendants from Using and Disclosing Its Confidential Information.**

It is well-established that the "improper use or disclosure of confidential information constitutes irreparable harm." *Pari Respiratory Equip., Inc. v. Groskopf,* 2007 WL 2745322 (E.D. Va. Sept. 18, 2007). Further, courts routinely hold that when one party interferes with another's customer relationships and, as a result, the customer relationships are placed at risk of damage or loss, courts do not hesitate to find a risk of substantial irreparable harm. *See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,* 22 F.3d 546, 552 (4th Cir. 1994) ("[W]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied."); *Lilly v. Sisk,* 1999 WL 370060, *4 (W.D. Va. Apr. 9, 1999) ("[A]ctual and imminent" risk of losing customers to defendants after defendant induced one customer to leave the plaintiff, and made several attempts to solicit other customers, supported a finding of irreparable harm.); *One Stop Deli, Inc. v. Franco's, Inc.,* 1993 WL 513298, at *7 (W.D. Va. Dec. 7, 1993) ("[I]rreparable harm may yet be found where the 'present predicament endangers [a business'] relations with customers ... [and] the goodwill built up by a heretofore successful enterprise ...' such that the damage is 'incalculable – not incalculably great or small, just incalculable.'").

SunTrust has satisfied this standard here.

First, the evidence submitted with this brief, including the Defendants' own email communications and the Declarations of Brenda Harris and Glenn Haywood, clearly establish that the Defendants surreptitiously acquired a substantial amount of critical SunTrust confidential and proprietary information, including but not limited to: (i)

14

sensitive personal information (such as Social Security Numbers) and financial information related to specific borrowers who had submitted that information to SunTrust – not to GMM; (ii) Pipeline Reports and other information concerning loans that SunTrust was actively pursuing; and (iii) Continuity Lists, Target Lists, lists of referral sources and similar information related to established and repeat clients, which are critical to SunTrust's marketing program.  Furthermore, King and Wright downloaded much of this information on their final days of employment with SunTrust, with unmistakable knowledge that their actions were improper and that they needed to keep their activities hidden from SunTrust, as their exchange on June 27, 2011 proves. Similarly, King and Dogan each emailed confidential information to their personal email accounts, and King emailed some information directly to her own GMM email address and to others at GMM. King also removed several hard copy files and, based on the circumstances and investigation to date, it appears that she has retained possession of several of them.

Second, it is clear that the Defendants have used this information in their solicitation efforts.  King's emails are incredibly enlightening, in that they show her use of SunTrust's information to steer borrowers to GMM over and over again in her final weeks.  Many of these customers had applied for and been approved for mortgage loans by SunTrust before and thus promised to be repeat customers until King diverted them. *See* Harris Decl. at ¶14.  Further, she shared this information readily with the other Defendants in an effort to coordinate their efforts with the borrowers. *See, e.g.,* Exhibit 15.

15

Finally, SunTrust's relationships and goodwill with borrowers, and its reputation, are among its most valuable assets. These assets have been placed at risk and, in some cases, irretrievably lost, as a result of Defendants' egregiously unfair and tortious activities. Defendants' deceptive course of conduct strongly suggests that they have every intention of ramping up their efforts to convert borrowers to GMM as rapidly as they can, using the SunTrust information they have stolen to assist them. These solicitations have not resulted from ordinary and fair competition, but from an organized conspiratorial scheme hatched by the Defendants in May, while the individual Defendants were still employed by, and supposedly working for the benefit of, SunTrust.

Without an injunction, the Defendants will continue to use the information stolen by their co-Defendants to compete unfairly with SunTrust.

### III.   The Balance of Equities Tips Decidedly in the Plaintiff's Favor, Since An Injunction Will Not Pose any Hardship on the Defendants They Did Not Bring on Themselves.

Pursuant to their contractual obligations, and in general because of their fiduciary duties, the individual Defendants were prohibited during their employment with SunTrust and thereafter from using SunTrust's proprietary information in a manner adverse to SunTrust's interests. Accordingly, the individual Defendants – and by extension GMM – have no legal right to misappropriate SunTrust's confidential and proprietary information or otherwise to engage in the foregoing activities. Thus, they will not be unjustly harmed if they are enjoined from doing so. *See Physicians Interactive v. Lathian Sys., Inc*, 2003 WL 23018270 at *5 (E.D.Va., Dec. 5, 2003). Accordingly, Defendants will incur minimal, if any, hardship if this Court enjoins them as requested, and certainly no hardship that is not justified in light of their egregious behavior. Moreover, SunTrust is

16

seeking comparatively modest relief with this motion – only an accounting, itemization,

preservation and return of the business and borrower information taken from SunTrust by

any of the Defendants.

**IV.     SunTrust Is Likely to Succeed On the Merits Of Its Claims Against Defendants.**

      **A.     The Individual Defendants Breached their Fiduciary Duties to SunTrust.**

Employees are agents of their employers and, under common law rules of agency,

owe a fiduciary duty of loyalty their employers.  The duty of loyalty is broad and

includes the duties of obedience, confidentiality and loyalty.  Restatement (Second) of

Agency, § 387 (1958).  Liability for breach of fiduciary duty has been imposed where

employees or directors misappropriated trade secrets, misused confidential information,

and solicited an employer's clients or other employees prior to termination of

employment. *Feddeman & Company, C.P.A., P.C. v. Langan Associates, P.C., et al.*, 260

Va. 35, 43-44, 530 S.E.2d 668, 673 (2000) (where employee defendants formulated plan

to resign en masse, and told other employees they could come too, "the totality of the

defendants' actions provided credible evidence to support a jury determination that their

conduct fell below the required standard of good faith and loyalty and constituted a

breach of fiduciary duty.").

This fiduciary duty is particularly high among employees such as King and

Dogan, who as Loan Officers had direct contact with customers and marketed SunTrust's

mortgage services.  The Fourth Circuit has held:

> Employment as a sales representative demands of the employee the
> highest duty of loyalty. It is not without its difficulties when the
> employment continues after the employee has arrived at a fixed
> determination to leave his employment, for then his interests and those of

17

his employer have lost their identity and may have become conflicting. Until the employment relationship is finally severed however, the employee must prefer the interests of his employer to his own. During such a period, he cannot solicit for himself future business which his employment requires him to solicit for his employer. If prospective customers undertake the opening of negotiations which the employee could not initiate, he must decline to participate in them. Above all, he should be candid with his employer and should withhold no information which would be useful to the employer in the protection and promotion of its interests.

*Community Counseling Serv., Inc. v. Reilly*, 317 F.2d 239, 244 (4th Cir. 1963).

Each of the individual Defendants breached the duty of loyalty owed to SunTrust during his or her employment.  The evidence shows or strongly suggests:

- Prior to leaving for GMM, the individual Defendants made arrangements for their staggered departures.  All Defendants participated in a plan to leave King and Wright at SunTrust for another month so that they could divert business opportunities to GMM.  King actually had a secure GMM email address set up for her use as early as June 1, 2011 – nearly a month before she resigned.

- At least three of the individual Defendants – Dogan, King and Wright – downloaded, copied and/or otherwise converted sensitive SunTrust information before their employment ended.  Their purpose in taking this information was undoubtedly to assist them in their efforts at GMM.

- All the individual Defendants have used that information in connection with their work at GMM to solicit and divert borrowers from SunTrust to GMM. King's emails in particular establish that she repeatedly usurped SunTrust corporate opportunities and that her access to SunTrust's confidential business information was an integral part of her efforts.

- Each of the Defendants worked seamlessly with the others to close and attempt to close business opportunities that were usurped from SunTrust. Podratsky, King and Rogers, for example, readily copied the other when communicating with borrowers, confusing the distinction and separation between GMM and SunTrust.

This evidence establishes that the individual Defendants, with the knowledge and support of each of the other Defendants after his or her resignation from SunTrust – did much more than make plans to compete before they resigned.  They actively competed

18

and diverted SunTrust's opportunities, to the benefit of not only the other individual

Defendants, but to GMM as well.

**B.**   **Defendants Engaged in an Unlawful Conspiracy to Injure SunTrust's Business.**

Virginia law specifically prohibits business conspiracies to injure another in its

trade or business.  The following elements establish such a claim:  (1) two or more people

acted in concert, agreed, associated, mutually undertook or combined together; (2) to

willfully and maliciously injure another in its business, reputation, trade or profession;

and (3) caused damage.  Va. Code §§ 18.2-499(A) and 18.2-500.  *See Virginia*

*Vermiculite, Ltd. v. W.R. Grace & Co. – Conn.*, 144 F. Supp.2d 558 (W.D. Va. 2001);

*Michigan Mut. Ins. Co. v. Smoot*, 128 F.Supp.2d 917 (E.D. Va. 2000).  The showing of

legal malice does not require a plaintiff to prove that the defendants' "primary and

overriding purpose is to injure another", but only that they acted "intentionally,

purposefully and without lawful justification." *Feddeman,* 260 Va. at 45, 530 S.E.2d at

674.

In this case, Defendants clearly acted together to willfully and maliciously injure

SunTrust in its trade and business.  Based on the evidence learned to date and set out

above, the conspiracy was hatched before Podratsky left for GMM.  The manner in which

the defections unfolded strongly suggests that they did not occur by mere happenstance,

but were well-coordinated and timed to ensure that SunTrust confidential information and

corporate opportunities could be diverted to GMM to enable the GMM Gainesville office

to secure a competitive boost by slowing SunTrust down and throwing it's Gainesville

office into a state of confusion.

Following the initial resignations of Podratsky, Hale, Rogers and Dogan, there was additional coordination among all the Defendants to maximize their diversion of SunTrust business, to the point that King actually said she had "teamed up" with Rogers, referred to Podratsky as her "Bossman," and regularly sent and received emails from others she described as "Team GMM."

## C.   Breach of Contract and Misappropriation of Trade Secrets

Like courts in most jurisdictions, Virginia courts consider three elements in assessing claims for breach of contract: (1) whether there is a valid contract; (2) whether the contract has been breached; and (3) whether the non-breaching party has suffered damages. *Westminster Investing Corp. v. Lamps Unlimited, Inc.*, 237 Va. 543, 546, 379 S.E.2d 316, 317 (1989).

Here, each of the individual Defendants promised upon hire not to use of disclose confidential SunTrust information and not to work on behalf of another employer during the time that they were employed by SunTrust. In addition, four of the individual Defendants executed offer letters promising to comply with SunTrust's Code of Business Conduct and Ethics, which prohibits employees from (i) disclosing sensitive client information or sensitive company information to any third party; (ii) using their association with SunTrust for personal gain; (iii) engaging in any business activity during their SunTrust employment "that competes with the business interests or activities of SunTrust"; (iv) taking for themselves "opportunities that are discovered through the use of SunTrust property, information or position"; (v) providing confidential or proprietary information to third parties. *See generally* Exhibit 16, and pp. 6, 7, 9, 10 thereof.

SunTrust stands a substantial likelihood of success in proving that the individual Defendants have breached these obligations. First, as described above, Dogan, Wright and King downloaded, copied or transmitted SunTrust's confidential information under circumstances that clearly betray their knowledge that their conduct was unlawful. Second, all of the Defendants have participated in the use of SunTrust's confidential information by using that information to solicit borrowers and profit from the loans that they have closed.

Moreover, much of this information comes within the definition of "trade secret" under Virginia law, and the Defendants' acquisition or disclosure of this information occurred under circumstances that they knew or should have known to be unlawful. Under the Virginia Uniform Trade Secrets Act, Va. Code Ann. §59.1-336, a "trade secret" is defined as:

> [I]nformation, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> 1.      Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
>
> 2.      Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* In the same provision, "Misappropriation" is defined to mean: The "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." *Id.*

Much of the information the Defendants have taken from SunTrust clearly falls with the scope of this provision. For example, Pipeline Reports, Customer Lists, Referral Sheets, Target Lists, and similar customer-oriented information qualifies as a "trade

secret" under Virginia law. *See, e.g., National Legal Research Group, Inc. v. Lathan*, 1993 WL 169789 (W.D. Va. May 17, 1991).

**D.    Tortious Interference with SunTrust's Contractual Prospective Business Relationships.**

In Virginia, the elements required for a *prima facie* showing of tortious interference with prospective business relationships are: (1) the existence of a prospective business relationship; (2) knowledge of the prospective business relationship on the part of the interfering party; (3) intentional interference by improper methods inducing or causing a loss of the prospective business relationship; and (4) resultant damage to the party whose prospective business relationship has been disrupted. *Rappahannock Pistol and Rifle Club v. Bennett*, 262 Va. 5, 12, 546 S.E.2d 440, 443 (2001) (*citing Chaves v. Johnson*, 230 Va. 112, 335 S.E.2d 97 (1985); *Duggin v. Adams*, 234 Va. 221, 226-27, 360 S.E.2d 832, 836 (1987).

All of these elements are plainly present in the instant case.

First, the Defendants interfered with SunTrust's business expectancies and relationships with borrowers who were looking to SunTrust for a mortgage loan. Many of these borrowers had secured loans through SunTrust before, and SunTrust stood a reasonable likelihood of closing the loans had King not diverted them to GMM. All the Defendants participate in this effort, whether from inside SunTrust or at GMM. Second, the methods employed by the Defendants – principally King but also the others – included independently tortious conduct, such as the diversion of corporate opportunities, the use of SunTrust's confidential business information, and, in some cases, the intentional confusion concerning their overlapping roles for SunTrust and GMM in violation of the Lanham Act. As such, the methods of interference were certainly

22

"improper." *See Duggin*, 234 Va. at 227, 360 S.E.2d at 836 ("Methods of interference considered improper are those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules."). Finally, SunTrust lost several loans as a result of this conduct, as King's emails prove that several of the diverted borrowers were closed at GMM.

## V.     **Injunctive Relief Against all Defendants is in the Public Interest**.

There is a strong interest in maintaining the *status quo ante litem* until the merits of a serious controversy can be fully considered by a trial court. *See The Seniors Coalition, Inc. v. The Seniors Foundation, Inc.*, 1996 WL 1065556, *5 (Va. Cir. Ct. June 10, 1996). In *One Stop Deli, Inc.*, 1993 WL 513298 at *8 the Court granted an injunction, observing that "[t]he public interest in this case obviously aims at striking a balance between vigorous, creative competition and basic conceptions of fairness[, but w]here fairness has been compromised too much, the public interest is served by an injunction that prevents further deterioration of the status quo."

In this case, an injunction will preserve the *status quo* by halting the Defendants' continued use of SunTrust's confidential and proprietary information. Without an injunction, the Defendants not only will be able to continue using SunTrust's information, but also will be able to steadily merge that information with their own, making it impossible for this Court to discern SunTrust's information from GMM's.

For all these reasons, SunTrust respectfully requests that the Court grant its motion and enter the temporary injunctive relief requested. Specifically, SunTrust requests that the Court order that all Defendants:

> (i)     create itemized lists of all files, documents, and other information,

whether in hard copy, electronic, or other format, that they, or any of them, collectively or individually: (i) have removed from SunTrust's premises or transmitted electronically from SunTrust; (ii) have obtained from someone who removed them from SunTrust's premises or transmitted electronically from SunTrust; or (iii) have or have had possession of or access to at any time since their respective employment with SunTrust ended and that they received from any other former SunTrust employee as a result of the conduct described herein;

   (ii) provide such lists to SunTrust;

   (iii) return to SunTrust all such files, documents and other information that are capable of being returned; and

   (iv) preserve, but not review, access, use or disclose, all such files, documents and other information that remain in their possession in electronic format, until further order of the Court.

        Respectfully submitted,

        Michael J. Lorenger, VSB #38910
        Susanne Harris Carnell, VSB #41521
        LORENGER & CARNELL PLC
        651 South Washington Street
        Alexandria, VA  22314
        Phone: (703) 684-1808
        Facsimile: (703) 684-1805
        mlorenger@lorengercarnell.com

        Counsel for SunTrust Mortgage, Inc.

## CERTIFICATE OF SERVICE

I certify that on this 5th day of August, 2011, I served a true and correct copy of the foregoing PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION FOR EMERGENCY *EX PARTE* RELIEF AND A TEMPORARY RESTRAINING ORDER by hand delivery on each of the following:

**GEORGE MASON MORTGAGE, LLC**
4100 Monument Corner Drive – Ste. 401
Fairfax, Virginia 22030

**ALICIA S. KING**
13749 Piedmont Vista Drive
Haymarket, Virginia 20169

**JAMES PODRATSKY**
5856 Tulloch Spring Court
Haymarket, Virginia 20169

**MICHAEL ROGERS**
9690 Bedder Stone Place
Bristow, Virginia 20136

**AMBER WRIGHT**
805 Wide Oak Court
Warrenton, Virginia 20186

**SAMANTHA DOGAN**
4022 Gallows Road
Annandale, Virginia 22003

**DONNA HALE,**
7781 Sharpshooters Court
Manassas, Virginia 20111

I also delivered copies by hand delivery to Peter D. Greenspun, Greenspun & Shapiro, 3955 Chain Bridge Road, Fairfax, VA  22030, counsel for Alicia King.

Michael J. Lorenger
Counsel for Plaintiff